*To be argued by: Pat J. Bombard*
*Time Requested:  15 Minutes*

18CV3658

# United States District Court
## For the Southern District of New York

MOTORS LIQUIDATION COMPANY ET AL.,
F/K/A GENERAL MOTORS., ET AL, DEBTORS,

*Plaintiff-Respondent,*

-against-

PAT J. BOMBARD,

*Defendant-Appellant.*



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6-28-18

**Case No.: 09-50026 (MG)**

## BRIEF ON BEHALF OF APPELLANT

Pat J. Bombard
Pro-Se Appellant
5 Wheeler Ave
Fayetteville, NY 13066
315.382.9464



## TABLE OF CONTENTS

STATEMENT OF THE CASE.................................................................1

QUESTION PRESENTED..................................................................4

ARGUMENT.....................................................................................5

POINT I
The Bankruptcy Court did not have the jurisdiction to adjudicate this matter............5

POINT II
General Motors racing to bankruptcy court ahead of a scheduled hearing
shows bad faith and a desire to use the system to their own gain ....................6

CONCLUSION .................................................................................7

## STATEMENT OF THE CASE

My name is Pat Bombard.  I am a Chevrolet dealer since 1992.  I am the owner of a Chevrolet franchise, and at one time I owned a Buick franchise, GMC franchise, Pontiac franchise and an Oldsmobile franchise.  I grew to be a leader in the industry in New York State and across the united states, winning numerous awards, sales competitions, service competitions and customer service competitions as a true leader in the industry.  I was a very profitable dealer from 1992-2008.  When General Motors filed bankruptcy, it created hardship and financial pain and loss for me as a business owner.  Through General Motors' bankruptcy, I was able to be awarded my franchise through the bankruptcy proceedings.  Because of General Motors' bankruptcy and GMAC's bankruptcy, I struggled but was able to obtain the necessary requirements set forth by General Motors to be an authorized dealer.

Attached as **Exhibit A** is the General Motors Corporation Dealer Sales and Service Agreement, good until October 31, 2010, stating:

This Agreement(s) shall expire on October 31, 2010 unless earlier terminated.

Dealer is assured of an opportunity to enter into a new Agreement(s) at the

1

expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

From 2008-2018 I spoke on many occasions with General Motors' Dealer Contractual Department for the Northeast region, which was run by Lynn Howard. Any attempts at renewing my dealer franchise were ignored, only to be replaced by additional requirements to obtain that franchise, which I met. Once Mr. Howard had the complete package, he forwarded it to the head legal attorney for General Motors, Deborah Collins, sending the same package at my behest from 2008-2018. On October 6, 2014, there was a New York State Department of Motor Vehicles Hearing (included as **Exhibit B**) in which Administrative Law Judge Walter Zulkoski decided:

> Section 46S.2(d}(1) of the Franchised Motor Vehicle Dealer Act allows a franchisor, in this case GM, to terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer only with due cause, regardless of the terms of the franchise agreement-and such due cause is lacking by a preponderance of the. evidence in GM's attempt to terminate Beck's franchise and GM is therefore prohibited from terminating Beck's franchise pursuant to reasons stated in its termination letter of June 11, 2013.

On October 31, 2015, we asked for the GM Bulletin 15-03 Hearing Process to commence (**Exhibit C**).

2

In October 2017, Ms. Collins was scheduled to meet with my Attorney, Frederick Guy via telephone, in order to come to a resolution, a meeting which she failed to attend. In December 2017, I took the matter in my own hands and approached the New York State Department of Motor Vehicles to schedule a safety and business hearing in order to resolve this dispute.

I was granted a hearing, scheduled for April 23, 2018 with the New York State Department of Motor Vehicles. On March 29, 2018, General Motors received a hearing in Bankruptcy Court to adjudicate the matter. After a second hearing on April 12, 2018, again in Bankruptcy Court, a decision was reached on April 13, 2018 granting General Motors the ability to control the franchise I had built, forcing me out of my business after twenty-six years.

## **QUESTION PRESENTED**

Did the Bankruptcy Court have the jurisdiction to adjudicate this matter,
superseding the jurisdiction of the New York State Department of Motor Vehicles.

Answer: No.

## **ARGUMENT**

**I.     The Bankruptcy Court did not have the jurisdiction to adjudicate this matter.**

The bankruptcy court lacks jurisdiction in this matter, as can be seen in the case of Beck Chevrolet Co., Inc. v. General Motors, LLC. Docket Nos. 13-4066 and 13-4310 (**Exhibit D**).  In that case, the Second Circuit Court of Appeals stated that the Department of Motor Vehicles was the proper venue for Beck's dispute with General Motors, a dispute that mirrors my own.  Proper jurisdiction belongs to the Department of Motor Vehicles and their dealer-franchise hearings:

> For the foregoing reasons, we REVERSE the district court's judgment in favor of GM on Beck's section 463(2)(gg) claim, VACATE the district court's judgment in favor of GM on Beck's section 463(2)(ff) claim, and REMAND to that court for further proceedings and the entry of judgment consistent with this opinion and the New York Court of Appeals's answers to our certified questions.

Attached as **Exhibit E** is the Application and Documents for the granted franchise hearing, comprised of letters from Mr. Guy to Deborah Collins on October 16, 2017 and the New York State Department of Motor Vehicles on December 19, 2017, as well a Request for Adjudicatory Proceeding, dated December 19, 2017 and Confirmation of said Hearing for April 23, 2018.

## II.    General Motors racing to bankruptcy court ahead of a scheduled hearing shows bad faith and a desire to use the system to their own gain.

General Motors, LLC, raced to the bankruptcy court on March 29, 2018, a court with no legal standing in this matter, to seek a decision. A hearing commenced on April 12, 2018 with a decision having been reached on April 13, 2018. This was all done with the full knowledge by all parties involved that a hearing was scheduled for April 23, 2018 at the New York State Department of Motor Vehicles, the proper venue for this matter. By reaching a decision ten days before the April 23 hearing, the need for a hearing in the proper venue was negated, overruled by a court with no jurisdiction or standing. The fact that this was arbitrated in a bankruptcy court when the matter has nothing to do with that is laughable. This is, and always has been about a breach of a Dealer Sales and Service Agreement between franchisor and franchisee, a legal battle that the bankruptcy court holds no jurisdiction over.

## CONCLUSION

General Motors, LLC overstepped the boundaries of jurisdiction to attempt to garner a favorable decision through the bankruptcy court, an improper venue for this type of case.  Due to the issues outlined above, the decision of the bankruptcy court favoring General Motors should be reversed and a hearing should be scheduled in the New York State Department of Motor Vehicles as is customary in this type of case and had been scheduled before the Appellee circumvented the jurisdiction.

6/4/2018

Pat J. Bombard

Pro-Se Appellant

5 Wheeler Ave

Fayetteville, NY 13066

315.382.9464

# EXHIBIT A

GMMS 09-50026-mg   Doc 14253-2   Filed 03/26/18
USA 11/2004

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective November 1, 2005, General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☒ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Buick Motor Vehicles, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks, ☐ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, ("General Motors") and BOMBARD CAR CO., INC., ☐ a proprietorship, ☐ a partnership, or ☒ a NEW YORK corporation, ☐ a limited liability company, or ☐ other business entity, doing business as Not Applicable and located at E GENESEE ST, SKANEATELES, NEW YORK, 13152, ("Dealer"), hereby enter into separate Agreement(s) for each Motor Vehicle Line-Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line-Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line-Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

## FIRST: TERM OF AGREEMENT(S)

This Agreement(s) shall expire on October 31, 2010 unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

## SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

## THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:
PAT J. BOMBARD
—
—

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
N/A
—
—

## FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)

This Agreement(s) and related agreement(s) are valid only if signed:
  (a)  on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and
  (b)  this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

## FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS

The following agreement(s) are hereby incorporated by reference into this Agreement(s):
NEW DEALER FACILITY LETTER AGREEMENT - C

BOMBARD CAR CO., INC.
—
Dealer Firm Name

By: _____
Dealer Operator and Date

**GENERAL MOTORS CORPORATION**

By: _____
Regional General Manager

By: _____ 9/4/05
Authorized Representative and Date

GM000224

# EXHIBIT B

New York State - Department of Motor Vehicles
Empire State Plaza, Albany, N. Y.

Enclosed is the Administrative Law Judge Findings concerning a Motor Vehicle hearing.

SAFETY HEARING BUREAU

Beck Chevrolet Co., Inc.
DBA Beck Chevrolet Saab
561 Central Park Ave.
Yonkers, NY 10704

OCT 1 0 2014

STATE OF NEW YORK
DEPARTMENT OF MOTOR VEHICLES
DIVISION OF SAFETY AND BUSINESS HEARINGS

---

BECK CHEVROLET CO., INC.
DBA BECK CHEVROLET SAAB
      Dealer/ Franchisee,

    v.

GENERAL MOTORS LLC,
      Franchisor

Case No. FMD 2013-02
Administrative Law Judge:
Walter Zulkoski

---

Pursuant to Article 17-A of the New York State Vehicle and Traffic Law, the Franchised Motor Vehicle Dealer Act (hereafter "FMVDA"), Beck Chevrolet Co., Inc., dba Beck Chevrolet Saab (hereafter "Beck") seeks to challenge a Notice of Termination of its Chevrolet franchise by General Motors LLC, (hereafter "GM"). This case was begun in accordance with Vehicle and Traffic Law Section 471-a, and 15 N.Y.C.R.R., part 127.13.

Section 463.2(e)(2) of the FMVDA provides that a franchisor, here GM, many not terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer, here Beck, except for "due cause" and "in good faith". GM's Notice of Termination indicates Beck has violated its franchise agreement by failing to meet the parties agreed sales performance requirements. In its Request for Adjudicatory Proceeding that initiated this case, Beck claims: GM's sales performance requirements are unreasonable; Beck has materially complied with the reasonable and necessary provisions of its franchise agreement; GM's stated reasons for terminating its franchise are pre-textual; such a termination lacks due cause; and GM is not acting in good faith. GM was represented by its attorney, James C. McGrath of Bingham, McCutchen, LLP. Beck was represented by its attorneys, Russell P. McRory and James M. Westerlind of Arent Fox, LLP.

The witnesses for GM included: Daniel J. Adamcheck, Regional Director of Chevrolet Sales, Service and Marketing, Alvon Giguere, Manager of Dealer Network Planning Analysis, Sharif Farhat, Urban Science Applications, Inc., Herb Walter, Certified Public Accountant and

OCT 1 0 2014

-2-

Russell Geller, a Vice-President/Dealer/Principal of Beck who testified for both sides.  The other witnesses for Beck included Joseph F. Roesner, The Fontana Group, Inc., and Edward Stockton, The Fontana Group, Inc.

The hearing to address these issues was held in Yonkers on September 22nd, 23rd, 29th, 30th, and October 1st and 2nd of 2014.  GM's Exhibits 1 through 83 and Beck's Exhibits 100 through 210 were received and marked into evidence during the hearing.

### FINDINGS OF FACT

Beck is a New York Corporation and a franchised motor vehicle dealer as defined in the FMVDA.  Beck has been a Chevrolet dealer since 1966 and its predecessors have operated at Beck's location since 1930.  GM is a Delaware Corporation authorized to do business in New York State and is a franchisor as defined in the FMVDA.  As part of a 2009 bankruptcy proceeding, General Motors Corporation (hereafter "Old GM") terminated some dealers offering them "Wind-Down Agreements" to terminate their franchises and offered other dealers, "Participation Agreements" to continue in operation.  Old GM then sold these agreements to GM.  Beck was offered a Wind-Down Agreement for a cash payment of $390,000.00.  Beck asked GM to reconsider its offer of a Wind-Down Agreement and several months later was given a Participation Agreement in 2009 (GM's Exhibit 9) which is an extension of GM's Dealer Sales and Service Agreement (GM's Exhibits 11 and 12).  As part of this process, GM reduced the number of dealers in the Westchester County, New York market area from 8 to 4, of which Beck was one of the remaining 4.

Upon entering into the Participation Agreement in this case GM expected and Beck agreed to: under Section 9(a) to increase its Retail Sales Index (hereafter "RSI") to 70 in 2010, 85 in 2011 and 100 in 2012; under Section 9(b) to obtain a Customer Satisfaction Index (hereafter "CSI") in sales and service that equals or exceeds the average for Chevrolet dealers in the GM's Northeast region; under 9(c) to make the necessary image improvements to comply with GM's Facility Image Requirements; and under Section 9(d) to

-3-

maintain actual net working capital that meets or exceeds the working capital standard established by GM.   In a letter dated June 8, 2012, GM, through its Dealer Network Manager, Michael A. Garrick, notified Beck that Beck had breached the Participation Agreement because Beck "failed to meet its performance obligations with respect to sales and is in material breach of the Dealer Agreement" (GM's Exhibit 45).   Pursuant to the FMVDA Section 463.2(e)(3), Beck was given 6 months to "correct its sales performance deficiencies".   Subsequently in a letter dated June 11, 2013 (GM's Exhibit 58), GM though its northeast regional director of sales, Daniel J. Adamcheck, gave notice to Beck that GM was terminating its Participation Agreement for failure to obtain the RSIs agreed to by the parties in the Participation Agreement stating "...Dealer's RSI for calendar 2011 was only 50.9, which constituted a breach of both the Dealer [Sales and Service] Agreement and the Letter [Participation] Agreement."

The measure of a Beck's sales performance under Section 9(a) of the Participation Agreement is its RSI.   The RSI is a percentage determined by the actual sales of a dealer over the dealer's expected sales.  An RSI of 100 indicates the dealer is selling the number of vehicles the franchisor expects can be sold in the dealer's Area of Geographic Sales and Service Advantage (hereafter "AGSSA").   The dealer's expected sales are determined by applying the Chevrolet's state market share in each segment (ie. Sedans, SUVs, pick-up trucks, etc.) to the competitive (other makes such as Ford and Chrysler)  vehicles registered in the dealer's  AGSSA.   This system for determining the RSI is commonly used by GM's competitors.

As part of its Participation Agreement, Beck agreed to achieve an RSI of 70 in 2010, 85 in 2011 and 100 in 2012.  GM waived the RSI requirement for Beck for 2010.  Beck's RSI for 2011 was 50.9 and for 2012, 50.6.   The other 22 dealers in the New York City metropolitan area (here the 9 downstate counties of Rockland, Westchester, Bronx, New York, Kings, Richmond, Queens, Nassau, and Suffolk as shown on Beck's Exhibit 149, tab 8,

page 3) had RSIs ranging from 22 to 234.5 in 2012 with 12 dealers with RSIs below that of Beck and 3 others within 5 points of Beck (Beck's Exhibit 153).   Mr. Adamcheck testified at the hearing that none of the other dealers in the nine downstate counties have received the 180 day notice to cure deficiencies or breaches that would subject the dealer to the termination process pursuant to FMVDA Section 463.2(e)(3).   Of the 4 dealers in Westchester County where Beck is located one had an RSI of 80.5, the second had an RSI of 53.1, and the third had an RSI of 50.2 in 2012.  In 2013, Beck's RSI was 105th out of 127 for New York State (pages 3 and 5 of GM's Exhibit 65).  Thus in 2013, 22 dealers in New York were below Beck's RSI but not one of those in the 9 downstate counties was facing the termination process that Beck is now challenging.  Section 463.2(gg) of the FMVDA provides that GM may not "use an unreasonable, arbitrary or unfair sales or other performance standard in determining a franchised motor vehicle dealer's compliance with a franchise agreement".

Both Beck and GM cite authorities to support their positions on the reasonableness of GM's method of obtaining the RSI of a particular dealer.  GM uses a statewide average that most of its competitors use.  Beck says in the termination process a more reasonable method is to use a New York City metropolitan average to include the 9 downstate counties of Westchester, Rockland, Bronx, New York, Richmond, Kings, Queens, Nassau, and Suffolk as it more closely resembles realistically what the market is like for Chevrolet products in the New York City metropolitan area or other method based on GM's New York metropolitan zone or a 30 mile radius around Beck's AGSSA.  Other jurisdictions have agreed with Beck that dealers in large metro areas should not be held to a statewide average.  Those case cited by Beck, North Shore, Inc. v. GM No. MVRB 79-01, 361 Ill.App.3d 271, affd. 224 Ill.2d 1 (Illinois), Landmark Chevrolet Corp. v. GM Dkt. No. 02-0002 LIC, 212 S.W.3d 425 (Texas), Halleen Chevrolet v. GM Case No. 03-050MVDB-277-SS, Case No. 06CVF-11739 and Andy Chevrolet v. GM Case No. 05-01-MVDB-304-J (Ohio) and GM v. Kinlaw 78

N.C.App. 521, 338 S.E.2nd 114 (North Carolina), support a more realistic RSI method for large metropolitan areas such as NYC.  This position is supported by the President of the New York State Automobile Dealers Association in a letter dated July 2, 2013 to GM's Global Chief of Marketing (tab 30 page 1 of Beck's Exhibit 149) and by Tom Liddy, the lead analyst for R.I. Polk & Co. forecasting practice (Beck's Exhibit 176).  Ironically, Beck's overall sales from 2009 (when Old GM became New GM) to 2014 almost doubled from 218 sales to 417 yet its RSI went from 40.4 to only 50.2 based on GM's statewide RSI standard (Beck's Exhibit 182, page 236).

The cases cited by GM to support its statewide standard of determining RSI show dealers who are performing   very poorly on many levels of comparison including sales: Giuffre Hyundai, LTD. dba Giuffre Hyundai v. Hyundai Motor America, USDC(EDNY) 13-CV-0520, (consumer fraud-New York); Hassett Lincoln-Mercury, Inc. dba Hassett Isuzu v. Isuzu Motors America, Inc. USDC (EDNY) No. 06-CV-00367, (lowest sales volume in entire U.S.-New York); In Matter of Lakes Subaru, Ltd., NH Motor Vehicle Industry Board Docket No. 0080, (last in state sales-New Hampshire); In the Matter of Seacrest Imported Auto, Inc. dba Nissan of Stratham, NH Motor Vehicle Industry Board Docket No. 04-06, affm'd NH Rockingham County Superior Court Docket No. 218-2010-CV-471 (last in state sales-New Hampshire);  Lanford Ford, Inc. v. Ford Motor Company, Maryland Motor · Vehicle Administration Case No. MDOT-MVA-12-03-10560, (lowest level of sales in region with no one else coming close-Maryland & District of Columbia).   A New York decision, Hartley Buick GMC Truck, Inc., dba Hartley Honda v. American Honda Motor Co., Inc., Case No. FMD 2010-05, aff'd Docket No. 28447 NYS DMV Administrative Appeals Board (New York) cited by GM is distinguishable on its facts as a poor performing dealership in many ways other than its RSI and was the "worst performing dealer in the State", p.2 Appeals Board decision. Beck is not the worst performing dealer in the New York metropolitan area or in the state.

-6-

GM contends the issue of whether the RSI is reasonable has already been decided by the U.S. District Court of New York in Beck Chevrolet Co., Inc., v. General Motors, LLC, 11 Civ. 2856 (GM's Exhibit 1) and Beck is thus collaterally estopped from raising the issue of reasonableness in this proceeding.  However as the NYS DMV Administrative Appeals Board stated in an interim appeal, Docket No. 32580 (April 29, 2014), in this case, FMD2013-02, the issue of reasonableness of the RSI is not precluded by the Federal Court decision as the burden of proof in this proceeding has shifted from Beck to GM.  Similarly, North Star Int'l Trucks, Inc. v. Navistar Inc., 2013 Minn. App. Unpubl. LEXIS 447 (Minn. Ct. of App. May 20, 3013), Iv. App.den. (Minn. Sup. Ct. Aug. 6, 2013) and Nesbitt v. Nimmich, 30 N.Y.2d. 622 (1972).  The Appeals Board also was concerned about factors that were beyond the control of Beck as downstate dealers faced stiffer competition from other makes, significant preference for other makes, reduced advertising by GM of the Chevrolet brand in the downstate market and Chevrolet's low market share of vehicles in the downstate market. GM cites New York case law that requires new evidence be presented in the collateral case to avoid inconsistent results, Schwartz v. Pub. Adm'r of Bronx Cnty., 246 N.E.2d 725 (N.Y. 1969), Gilberg v. Barbieri, 423 N.E.2d 807, 809, (N.Y. 1981), Kosakow v. New Rochelle Radiology Associates, 274 F.3d 706, 731-732 (2d Cir. 2001), In re Bennett Funding Grp., Inc., 367 B.R. 269, 293-294 (Bankr. N.D.N.Y. 2007, Norris v. Grosvenor Mktg.Ltd., 803 F.2d 1281, 1286 (2d Cir. 1986).  Here the evidence indicates that among the "underperforming" dealers in the 9 downstate counties GM is only proceeding against Beck.  There is nothing in the U.S. District Court decision in Beck, supra, indicating that evidence of how the standard was being enforced was presented in determining reasonableness of GM's RSI standard.  In other words, is the standard reasonable if not all dealers are being held to it.

Given the fact that most of the dealers in the New York City metropolitan area are not meeting GM's statewide RSI standard and are not being terminated, the statewide RSI standard that GM uses is not reasonably applied. However, assuming GM's statewide RSI

standard is reasonable or whereas here, even if a NYC metropolitan area RSI standard is used, Beck has not meet the RSIs agreed to in its Participation Agreement with GM of 100 by 2012, is this a reason to terminate its franchise?   GM does not base its decisions to terminate a franchise agreement solely on the basis of the dealer's RSI per the transcript of Alvon Giguere, GM's Manager of Dealer Networking Planning and Analysis (Exhibit A on page 288 attached to Beck's Administrative Appeal Form).  Similarly Article 9 of the Dealer Sales and Service Agreement (GM's Exhibit 12) which provides in "addition to the Retail Sales Index, General Motors will consider any other relevant factors in deciding whether to proceed under the provisions of Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities."   Though contrary to this assertion by Mr. Giguere and Article 9 of the Dealer Sales and Service Agreement, the termination letter of Mr. Adamachuk (GM's Exhibit 58) gives no reason for the termination other than Beck's failure to meet its RSI.   Section 463.2(d)(1) of the FMVDA requires that the termination notice must state "the specific grounds for such termination, cancellation or refusal to renew".   If RSI alone is not the sole basis to terminate a franchise, then failure of Beck to attain the RSI in the Participation Agreement is not a material breach of the Participation Agreement as required by FMVDA Section 463.2(e)(2) as no other "specific" reason is given in the termination letter of Mr. Adamcheck.

Has Beck performed poorly under the other provisions of the Participation Agreement?   Under Section 9(b) of the Participation Agreement, GM also evaluates its Facility Image requirements.   It does not like Beck's facility's physical appearance.  Though while GM has shown photos of Beck's facility (GM's Exhibit 26) and compared it to competing brand facilities in Beck's AGSSA, (pages A-54, A-55, & A-56 attached to GM's Exhibit 70), it has not shown photos of what other Chevrolet dealers' facilities look like to support its claim that Beck's facility is below its standards by a preponderance of the evidence.  Also the picture of Beck's facility (page A-54 of GM's Exhibit 70) is in marked

contrast to Beck's picture of its facility (Beck's Exhibit 113) and is closer to the demands of GM's Design Intent Documents (GM's Exhibit 50).  Additionally the testimony or GM's Zone Manager William Flook for Beck's Zone in the U.S. District Court case 11 Civ. 2856 stated that image is only a function of sales over the long term.  Exhibit H, a GM produced list, attached to Beck's Administrative Appeal Form shows Beck met or exceeded the other requirements of the Participation Agreement (see also Beck's Exhibits 115 through 119 and 136 through 148).   Under Section 9(c) of the Participation Agreement Beck's Consumer Satisfaction Index (hereafter CSI) exceeds zone and regional averages as of October 21, 2013.  Ironically another dealer, Major Auto in Queens County, with an RSI of over 100 had a Purchase and Delivery Satisfaction Survey rating of only 45 while Beck with an RSI of 50.24  had a rating of 92.6 (Exhibit I attached of Beck's Administrative Appeal Form).  Under Section 9(d) of the Participation Agreement, its net working capital exceeds GM's guidelines by 30%.  Additionally Beck out performs the district, zone and regional averages for GM training standards.  Its new car advertising exceeds district, zone, and regional averages. Beck's average gross profit on new vehicles is below district and zone averages meaning its vehicles are not being priced too high.   Beck and Beck personnel have received commendations and awards from GM (Beck's Exhibits 108, 115 through 121).  Thus in every other aspect other that it's RSI, Beck has complied with the reasonable and necessary provisions of its Participation Agreement.

In its Request For Adjudicatory Proceeding, Beck raises two issues, bad faith on the part of GM and GM's decision is pre-textual.  The fact that GM may be attempting to create more opportunities for another dealer or dealers in Westchester County as evidenced by an email of Robert Seacrest to Troy Irrer, dated April 4, 2011 (Exhibit I attached to Beck's Request For Adjudicatory Proceeding), is too speculative and is not supported by any other evidence of bad faith on the part of GM.  There is no evidence that GM's decision to

terminate Beck's franchise is pre-textual, though Mr. Geller in his testimony admitted he knew GM's plans were to put another dealer at his location should he be terminated.

For the New York City metropolitan area, the RSI standard of GM is unreasonable as it does not realistically reflect the Chevrolet sales challenges that Beck and other New York metropolitan dealers face and GM is not applying the RSI uniformly to all dealers in New York and thus GM lacks due cause to terminate Beck's franchise. Beck's CSI exceeds zone and regional averages.  Its GM training standards exceed district, zone and regional averages.  Its new car advertising exceeds district, zone, and regional averages.  Its net working capital exceeds GMs guidelines.  Its new car prices are not set too high.  Bases on the RSIs of other dealers in the 9 downstate counties, Beck is materially and reasonably complying with its sales performance requirements as compared to other dealers.  There is not sufficient evidence to support GM's assertion that Beck's physical appearance does not meet its standards for other NY Chevrolet dealers.  GM's method of the determining the RSI as applied for metropolitan NYC is unreasonable and the performance of Beck otherwise materially meets the standards of GM, therefore GM lacks due cause to terminate Beck's franchise.

**DISPOSITION:**

Section 463.2(d)(1) of the Franchised Motor Vehicle Dealer Act allows a franchisor, in this case GM, to terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer only with due cause, regardless of the terms of the franchise agreement and such due cause is lacking by a preponderance of the evidence in GM's attempt to terminate Beck's franchise and GM is therefore prohibited from terminating Beck's franchise pursuant to reasons stated in its termination letter of June 11, 2013.

Dated: October 6, 2014
       Yonkers

Walter Zulkoski
Administrative Law Judge

EXHIBIT C



**General Motors LLC**

**Date:**   May 20, 2015                          GM 15-03

**To:**   General Motors Dealers

**Subject:**   Policies Applicable to Key Contractual Dealer Positions

This bulletin, together with bulletin GM 15-04, "Financial Requirements for General Motors Dealers," replaces bulletin GM 04-09, "Policies for Changes in GM Ownership/Management," dated April 23, 2004.

The success of GM dealers, and ultimately GM itself, depends on many factors, including customer demand for GM products and customer enthusiasm throughout the shopping, purchase and ownership experience. Therefore, the quality of GM's dealer network is critical to the success of GM and the GM dealer network as a whole.

This bulletin supports the General Motors Dealer Sales and Service Agreement and states GM policies applicable to both existing and prospective GM dealers and their Dealer Operators, Dealer Investors, Successor Dealer Operators, Multiple Dealer Operators, Multiple Dealer Investors and Executive Managers.

GM is responsible for the administration of the dealer network to ensure that GM dealerships are owned and operated by qualified individuals who strive to make the customer experience a key driver in the consumer's decision to purchase GM products and services. Included in this bulletin are definitions of these key positions and the qualifications and requirements for each.

## A. DEFINITIONS

### DEALER SALES AND SERVICE AGREEMENT ("Dealer Agreement" or "DSSA")
The Dealer Sales and Service Agreement, Standard Provisions, Dispute Resolution Process, and all related addenda. The Dealer Agreement is a personal services agreement, is not owned by the Dealer Company, and cannot be sold, assigned, delegated, encumbered or otherwise transferred by the Dealer Company.

### DEALER
The legal business entity, (i.e. corporation, partnership, limited liability company, or limited liability partnership) that enters into the Dealer Agreement with GM, also referred to as the "Dealer Company".

### DEALER OPERATOR
The individual identified in the Dealer Agreement who has full managerial authority over dealership operations and is responsible for the Dealer meeting all of its obligations under the Dealer Agreement.

### DEALER INVESTOR
An individual, trust, holding company, or other legal entity that has an ownership interest in the Dealer Company, and is identified on the Dealer Statement of Ownership.   A Dealer Investor may also be referred to as an owner, financial investor, stockholder, partner, member, etc., depending on the nature and form of the Dealer Company's business.

# Exhibit 24

**SUCCESSOR DEALER OPERATOR**
The individual identified on the Successor Addendum to the Dealer Agreement and designated by the Dealer Company as the possible successor Dealer Operator in the event of the death or incapacity of the current Dealer Operator.

**MULTIPLE DEALER OPERATOR ("MDO")**
An individual who is named as Dealer Operator in two or more GM dealerships.

**MULTIPLE DEALER INVESTOR ("MDI")**
An individual who holds an ownership interest in two or more GM dealerships.

**EXECUTIVE MANAGER**
The individual named on the Executive Manager Addendum to the Dealer Agreement, proposed by and responsible to the Dealer Operator for running the day-to-day operations of the GM dealership.

**CANDIDATE**
For purposes of this bulletin, a proposed Dealer Operator, Dealer Investor, Successor Dealer Operator, Multiple Dealer Operator, Multiple Dealer Investor or Executive Manager may also be referred to as the "Candidate."

## B. CANDIDATE QUALIFICATIONS AND REQUIREMENTS

1. **PERSONAL BACKGROUND AND EXPERIENCE**
   In evaluating a Candidate's qualifications, GM will take into consideration the individual's personal background and experience.  Candidates must have established a successful customer-oriented, personal and business reputation and background that will positively impact the reputation of the Dealer Company and GM.  All Candidates will be required to complete an application and approve a background check.

2. **CRIMINAL OR CIVIL LEGAL PROCEEDINGS**
   Because the reputation of GM and its dealers is dependent upon the personal qualifications of GM Dealer Company investors and operators, GM has established the following policies relative to criminal or civil legal proceedings involving Candidates.  For purposes of this section, an "Affiliated Business Entity" is any corporation, partnership or other business entity in which a Candidate is an investor.

   - General Motors will not approve any proposed Candidate who has been convicted of or plead guilty to a felony, or who has pending against him/her at the time of his/her application any charges or indictments that could result in a felony conviction.  General Motors may consider exceptions to this policy in its sole business judgment where the Candidate has received a formal pardon and/or where the record of the felony conviction or plea has been expunged.

   - General Motors will not approve a Candidate if an Affiliated Business Entity has committed any crime that resulted in a felony conviction against the Affiliated Business Entity, or has a felony charge or indictment pending at the time of the application.  General Motors may consider exceptions to this policy in its sole business judgment where the Affiliated Business Entity has received a formal pardon and/or where the record of the felony conviction or plea has been expunged.

   - If a proposed Candidate or Affiliated Business Entity (i) has been convicted or found guilty of a misdemeanor, whether civil or criminal in nature, (ii) has entered into a settlement arising from such charges, or (iii) has pending against them at the time of the application such charges or allegations, General Motors will request an explanation from the Candidate and will review other relevant information, including but not limited to the findings of any applicable state or federal authority.  If the facts are such that GM determines, in its sole business judgment, that the matter

GM000304

Case 1:18-cv-03658-VSB    Document 6    Filed 06/28/18    Page 27 of 122
09-50026-mg    Doc 14253-2    Filed 03/26/18    Entered 03/26/18 10:02:47    Exhibit B
Pg 359 of 406

3

will not adversely affect the reputation of GM, GM's dealer network, or the relationship between GM and the Dealer Company, then GM may elect to approve the Candidate's proposal.

## 3. DEALER OPERATOR

In order for General Motors to provide its customers a world-class purchase and ownership experience, GM will consider whether the approval of a Candidate will likely result in successful dealership operations with satisfactory sales, service, and facilities, while promoting and preserving competition and customer satisfaction.

Many factors affect General Motors' decision whether to approve a Candidate as Dealer Operator. Over the years Candidates have had varied business experience, either with General Motors or other automotive companies, or outside the automotive industry. In its review of the Candidate's business experience, GM will consider the qualifications and requirements described below, including a review of the performance of any automotive dealerships which the Candidate has either operated or owned (in whole or in part). GM will assess the Candidate's business experience and overall business portfolio performance and exercise its business judgment whether to approve the Candidate. (See Article 2 of the Dealer Agreement.)

General Motors will take into consideration the performance of any GM and non-GM dealerships which the Candidate currently or previously owned (in whole or in part) or operated, as well as any other businesses the Candidate owns or operates. GM's review of dealership performance will include, but is not limited to, sales performance, customer satisfaction, capitalization, and profitability. Candidates are expected to be meeting the minimum performance standards required under the GM Dealer Sales and Service Agreement(s) and the dealer agreements for non-GM line makes. The Dealer Agreement requires a minimum Retail Sales Index (RSI) of 100, Customer Satisfaction scores at or above region average, and net working capital at or above the capital standard established by GM.

### Attributes

- Possess personal characteristics that demonstrate the Candidate is an upstanding member of her/his community (Refer to paragraphs B1. - Personal Background and Experience and B2. - Civil or Criminal Legal Proceedings for additional information);

- Have a successful record as a merchandiser of automotive products and services, or otherwise have demonstrated the ability to successfully manage a dealership;

- Have an established customer-oriented personal and business reputation and demonstrate the following:

   Business Management Skills
   - Talent building              - Establishing dealership direction
   - Business savvy               - Operational decision-making
   - Customer Focus               - Business results
   - Financial Acumen             - Entrepreneurial spirit

   Interpersonal Skills
   - Compelling communicator
   - Cultivate networks

   Leadership Skills
   - Lead change                  - Coach and develop others
   - Sell vision                  - Passion for results
   - Influence others

GM000305

Case 1:18-cv-03658-VSB   Document 6   Filed 06/28/18   Page 28 of 122
09-50026-mg    Doc 14253-2    Filed 03/26/18   Entered 03/26/18 10:02:47    Exhibit B
Pg 360 of 406

4

**Requirements**
- Maintain a minimum 15% unencumbered ownership interest in the Dealer Company;

- Provide evidence through source of funds, gift letter, loan, ownership by agreement, etc., of the capacity to make the proposed investment in the Dealer Company;

**Conditions**
- Only one person may be named as Dealer Operator at a GM dealership;

- An individual named as Dealer Operator cannot also be named as Successor Dealer Operator or Executive Manager at the same GM dealership;

- An individual named as Dealer Operator cannot also be named as Executive Manager at any other GM dealership;

- Upon the death or incapacity of the Dealer Operator, the Dealer Company must propose an Executive Manager to run the operations if a replacement Dealer Operator is not named within a reasonable period of time.

### 4. DEALER INVESTOR

**Attributes**
- Possess personal characteristics that demonstrate the Candidate is an upstanding member of her/his community (Refer to paragraphs B1. - Personal Background and Experience and B2. - Civil or Criminal Legal Proceedings for additional information);

**Requirements**
- Provide evidence through source of funds, gift letter, loan, ownership by agreement, etc., of the capacity to make the proposed investment in the Dealer Company;

### 5. SUCCESSOR DEALER OPERATOR
**(Proposed to be named on the Successor Addendum to the Dealer Agreement)**

**Attributes**
- Currently meets and maintains all qualifications and attributes to become a Dealer Operator, or is being trained to qualify as a Dealer Operator. (See Article 12 of the Dealer Agreement.)

**Requirements**
- Currently is, and will continue to be employed full-time by the Dealer Company or a comparable automotive dealership.

**Conditions**
- Dealer Company must be meeting all of its obligations under the Dealer Agreement(s);

- Only one person may be named as Successor Dealer Operator at a GM dealership;

- Upon the death or incapacity of the Dealer Operator, GM will consider a proposal submitted by the Dealer Company to appoint as Dealer Operator the individual named on the Successor Addendum, provided he/she possess all the attributes and meets all the requirements to become a Dealer Operator.

## 6.  MULTIPLE DEALER OPERATOR / MULTIPLE DEALER INVESTOR

### MDO
An individual may be named as Dealer Operator at more than one GM dealership, provided he or she meets the qualifications and requirements applied to all Dealer Operator Candidates, including those described in Paragraph 3 above in it's entirety, and is able to manage the GM dealership so that it meets all of the performance, operational and other requirements of the Dealer Agreement.

### MDI
In determining the qualifications of a proposed investor in a General Motors dealership, GM may review the performance of any GM and/or non-GM dealerships in which the Candidate currently invests, as well as any other businesses the Candidate owns or operates.  GM's review may include, but is not limited to, sales performance, customer satisfaction, capitalization, and profitability.  GM may review the performance of each of the Candidate's dealerships and other business interests, and assess the overall business portfolio performance in exercising its business judgement in deciding whether to approve the Candidate.

### NUMBER OF DEALERSHIPS
General Motors may elect to turn down a proposal by an MDI/MDO to acquire an additional GM dealership or line make, if, in its sole business judgment, General Motors determines the acquisition may reduce competition in the area and/or result in the MDI/MDO owning or operating an unreasonable number of GM dealerships.

## 7.  EXECUTIVE MANAGER
As stated in Article 2 of the Dealer Agreement, successfully operating a GM dealership requires the Dealer Operator to exercise full managerial authority over the dealership operations. However, in the rare instance where a Dealer Operator is not able run the day to day dealership operations on a regular basis, Dealer may propose an Executive Manager to run the daily operations on behalf of the Dealer Operator. GM will review the proposal and, if the circumstances warrant the appointment of an Executive Manager, will approve the Executive Manager, provided he/she meets the requirements and qualifications listed below.

For Multiple Dealer Operators, GM recognizes the challenges of effectively managing the daily operations of multiple dealerships.  Therefore, Executive Managers, approved by GM, are required at all GM dealership locations, although the Multiple Dealer Operator may run the day-to-day operations of one GM dealership or designate individual Executive Managers at all of the GM dealerships.

The appointment of an Executive Manager does not relieve the Dealer Operator of the responsibility for the Dealer Company meeting all of its obligations under the Dealer Agreement.  Further, the Dealer Operator may not delegate the authority to sign the Dealer Agreement and related addenda to anyone, including the Executive Manager.

### Attributes
- Demonstrate the ability to successfully manage the daily operations of the entire dealership.

### Requirements
- Be employed at the dealership on a full time basis;

- Live close enough to the dealership to be able to fulfill the day to day management responsibilities as Executive Manager;

- Serve as the business contact for GM personnel for daily business activities involving the dealership.

GM000307

Case 1:18-cv-03658-VSB   Document 6   Filed 06/28/18   Page 30 of 122
09-50026-mg    Doc 14253-2    Filed 03/26/18    Entered 03/26/18 10:02:47    Exhibit B
Pg 362 of 406

6

**Conditions**

- The Dealer must propose a qualified individual to be named Executive Manager;

- GM's approval of a proposed Executive Manager will be recognized by signing an Executive Manager Addendum to the Dealer Agreement;

- A GM dealership may have only one Executive Manager;

- An individual may be named as Executive Manager at only one dealership;

- The Executive Manager cannot have management responsibilities at any other dealership;

- The Executive Manager may (but is not required to) be an investor in the Dealer Company;

- A Dealer Operator cannot be named as an Executive Manager at any GM dealership;

- Any change in Executive Manager requires GM's prior written approval.  Such approval will be reflected by signing a new and superseding Executive Manager Addendum.

## C. OWNERSHIP / INVESTMENT BY TRUSTS AND HOLDING COMPANIES

GM will review existing or proposed ownership interests in a Dealer Company held by, assigned, or transferred to a trust, holding company, or other legal entity on a case-by-case basis.

**Trust:**  General Motors will evaluate the trust, including the type of trust, assets placed in the trust, trustees, and beneficiaries.  GM will evaluate the trustees and beneficiaries consistent with its policies covering Candidate background, including legal proceedings.  Additionally, in evaluating the Dealer Company ownership rights proposed to be held in trust, GM will take into consideration the ownership requirements under Article 2 of the Dealer Agreement, and exercise its business judgment in deciding whether to approve the proposed ownership structure.

- GM's approval of Dealer Company ownership held in trust will be evidenced by the execution of a Dealer Statement of Ownership reflecting the trust ownership and a letter agreement signed by the Dealer Operator, the trustee(s) and GM.

- Neither the actual nor the beneficial ownership interest in a Dealer Company held in the trust will be changed without GM's express and prior written approval.  GM's approval of a proposed change will be evidenced solely by means of a new and superseding Dealer Statement of Ownership and a letter agreement signed by the Dealer Operator, the trustee(s) and GM.  Once a transfer of Dealer Company ownership interests to a trust has been approved by GM, the following events will require GM's prior written approval:

   a. The trust transfers Dealer Company ownership interests to the current beneficiaries of the trust or to anyone other than the current beneficiaries; or

   b. The trust terminates and Dealer Company ownership interests are transferred to the current beneficiaries of the trust or to anyone other than the current beneficiaries; or

   c. The trust is amended to change the beneficiaries or trustee(s).

**Holding Company:**  General Motors will evaluate the holding company, its ownership structure and its assets.  GM will evaluate the holding company investors consistent with its policies covering Candidate background, including legal proceedings.  Additionally, in evaluating the holding company's proposed ownership interest in the Dealer Company, GM will consider the ownership requirements under Article

Case 1:18-cv-03658-VSB   Document 6   Filed 06/28/18   Page 31 of 122
09-50026-mg    Doc 14253-2    Filed 03/26/18    Entered 03/26/18 10:02:47    Exhibit B
Pg 363 of 406

7

2 of the Dealer Agreement, and exercise its business judgment in deciding whether to approve the ownership structure.

- GM's approval of a holding company's proposed ownership interest in a Dealer Company will be evidenced by the execution of a Dealer Statement of Ownership and a letter agreement signed by the Dealer Operator and GM.

- Changes in the ownership of the holding company cannot be made without GM's prior written approval.   GM's approval will be evidenced by the execution of a new and superseding Dealer Statement of Ownership and letter agreement.

### D. <u>MISREPRESENTATION</u>
The relationship between General Motors and its dealers requires full and complete disclosure in connection with a variety of matters.  Therefore, any false, incorrect or misleading statement or omission, whether intentional or unintentional, in the information submitted to GM by a Candidate in connection with an application for a Dealer Agreement or any related application or proposal package materials, will be grounds for rejection of the application, or for termination of the Dealer Agreement.

### E. <u>DEALER SALES AND SERVICE AGREEMENT</u>
GM will not approve a Candidate unless the Dealer Company and Candidate can demonstrate to GM's satisfaction that they are able and likely to fulfill all of the terms and requirements of the Dealer Agreement.

GM000309

GMMS 1013
11 2015 USA

# Dealer Sales and Service Agreement 2015

## Standard Provisions

## GENERAL MOTORS LLC

GM000310

# Exhibit 25

# Table of Contents

PURPOSE OF AGREEMENT ...................................................1

**ARTICLE 1.  APPOINTMENT AS AUTHORIZED DEALER** ...........1

**ARTICLE 2.  DEALER OPERATOR** .........................................2

**ARTICLE 3.  DEALER INVESTOR** ..........................................2

**ARTICLE 4.  AUTHORIZED LOCATIONS** ...............................2
4.1      Dealer Network Planning .........................................2
4.2      Area of Primary Responsibility .................................3
4.3      Establishment of Additional Dealers ........................3
4.4      Facilities .................................................................4
    4.4.1      Location .......................................................4
    4.4.2      Change in Location or Use of Premises ..........4
    4.4.3      Size ..............................................................4
    4.4.4      Dealership Image and Design ........................4
    4.4.5      Dealership Equipment ...................................5

**ARTICLE 5.  DEALER'S RESPONSIBILITY TO
PROMOTE, SELL, AND SERVICE PRODUCTS** .......................5
5.1      Responsibility to Promote and Sell ...........................5
5.2      Responsibility to Service ...........................................6
5.3      Customer Satisfaction ..............................................7
5.4      Business Planning ....................................................7
5.5      Dealer Council .........................................................8
5.6      Electronic, Communications, Data Interchange and Electronic
    Transactions. ............................................................8
5.7      Exchange of Information and the Handling of ...........8
    Customer Information

**ARTICLE 6.  SALE OF PRODUCTS TO DEALER** ......................9
6.1      Sale of Motor Vehicles to Dealer ..............................9
6.2      Sale of Parts and Accessories to Dealer ....................9
6.3      Prices and Other Terms of Sale .................................9
    6.3.1      Motor Vehicles ............................................9
    6.3.2      Parts and Accessories ..................................10
6.4      Inventory ................................................................10
    6.4.1      Motor Vehicle Inventory .............................10
    6.4.2      Parts and Accessories ..................................10
6.5      Warranties on Products ...........................................10

**ARTICLE 7.  SERVICE OF PRODUCTS** ..................................11
7.1      Service for Which General Motors Pays ...................11
    7.1.1      New Motor Vehicle Pre-Delivery Inspections
        and Adjustments ...........................................11
    7.1.2      Warranty and Special Policy Repairs ...........11
    7.1.3      Field Actions and Corrections .....................11
    7.1.4      Payment for Pre-Delivery Adjustments, Warranty, Field
        Actions and Transportation Damage Work .....11
7.2      Parts and Accessories, and Body Repairs ..................11
    7.2.1      Warranty and Policy Repairs .......................11
    7.2.2      Representations and Disclosures as to Parts and Accessories
        ..................................................................12
    7.2.3      Body Repairs ...............................................12
    7.2.4      Tools and Equipment ..................................12

**ARTICLE 8.  TRAINING** ......................................................12

**ARTICLE 9.  REVIEW OF DEALER'S SALES PERFORMANCE** ...........13

**ARTICLE 10.  CAPITALIZATION** .........................................13
10.1     Net Working Capital ...............................................13
10.2     Wholesale Floorplan ...............................................13

**ARTICLE 11.  ACCOUNTS AND RECORDS** ...........................14
11.1     Uniform Accounting System ...................................14
11.2     Submission of Accurate Applications and Information ...........14
11.3     Examination of Accounts and Records ...................14
11.4     Confidentiality of Dealer Data ...............................14

**ARTICLE 12.  CHANGES IN MANAGEMENT AND OWNERSHIP** ...........14
12.1     Succession Rights Upon Death or Incapacity ..............14
    12.1.1     Successor Addendum ..................................14
    12.1.2     Absence of Successor Addendum ...............15
    12.1.3     Successor Dealer Operator Requirements ...........15
    12.1.4     Term of New Dealer Agreement ................15
    12.1.5     Notice of Decision .....................................15
    12.1.6     Cancellation of Addendum .........................15
12.2     Other Changes in Ownership or Management ..............15
    12.2.1     Prior Approval ...........................................15
    12.2.2     General Motors Review of Proposal ...........16
    12.2.3     General Motors Response ...........................16
    12.2.4     Dealer Change in Proposal .........................16
    12.2.5     Transfer of Equity under 10 Percent ...........16
    12.2.6     Satisfaction of Indebtedness to GM ...........16
12.3     Right of First Refusal to Purchase ...........................16
    12.3.1     Creation and Coverage ...............................16
    12.3.2     Purchase Price and Other Terms of Sale ...........16
    12.3.3     Consummation ...........................................17
    12.3.4     Assignment. ...............................................17
    12.3.5     Transfer Involving Family Members and Dealer Management ...........17
    12.3.6     Expenses. ...................................................17

**ARTICLE 13.  BREACHES AND OPPORTUNITY TO REMEDY** ...........18
13.1     Certain Acts or Events ............................................18
13.2     Failure of Performance by Dealer ............................19

**ARTICLE 14.  TERMINATION OF AGREEMENT** ...................19
14.1     By Dealer ................................................................20
14.2     By Agreement ..........................................................20
14.3     Failure to be Licensed .............................................20
14.4     Incapacity of Dealer Operator .................................20
14.5     Acts or Events ........................................................20
14.6     Reliance on Any Applicable Termination Provision ...........21
14.7     Transactions After Termination ...............................21
    14.7.1     Effect on Orders .........................................21
    14.7.2     Termination Deliveries ...............................21
    14.7.3     Effect of Transactions After Termination ...........21

**ARTICLE 15.  TERMINATION ASSISTANCE** .........................21
15.1     Deferral of Effective Date .......................................21
15.2     Purchase of Personal Property .................................21
    15.2.1     General Motors Obligations ........................21
    15.2.2     Dealer's Responsibilities ............................22
    15.2.3     Payment. ....................................................23
    15.2.4     Replacement Dealer ...................................23
15.3     Assistance on Premises ...........................................23
    15.3.1     General Motors Obligation .........................23
    15.3.2     Owned Premises .........................................23
    15.3.3     Leased Premises .........................................24
    15.3.4     Rent and Price ...........................................24
    15.3.5     Limitations on Obligation to Provide Assistance ...........24

**ARTICLE 16.  DISPUTE RESOLUTION PROCESS** ...................25

**ARTICLE 17.  GENERAL PROVISIONS** .................................25
17.1     No Agent or Legal Representative Status .................25
17.2     Responsibility for Operations ..................................25
17.3     Taxes ......................................................................26
17.4     Indemnification by General Motors .........................26
17.5     Trademarks and Service Marks ................................26
17.6     Notices ...................................................................27
17.7     No Implied Waivers ................................................27
17.8     Assignment of Rights or Delegation of Duties ..............27
17.9     No Third Party Benefit Intended .............................28
17.10    Accounts Payable ....................................................28
17.11    Sole Agreement of Parties .......................................28
17.12    Applicable Law ......................................................28
17.13    Superseding Dealer Agreements ..............................29

**GLOSSARY** ........................................................................30

GM000311

# Standard Provisions

The following Standard Provisions are part of the General Motors Dealer Sales and Service Agreement(s) (Form GMMS 1012).

# PURPOSE OF AGREEMENT

The purpose of this Agreement is to promote a relationship between General Motors and its Dealers which encourages and facilitates cooperation and mutual effort to satisfy customers, and permits General Motors and its dealers to fully realize their opportunities for business success. General Motors has established a network of authorized dealers operating at approved locations to effectively sell and service its Products and to build and maintain consumer confidence and satisfaction in Dealer and General Motors. Consequently, General Motors relies upon each Dealer to provide appropriate skill, capital, equipment, staff and facilities to properly sell, service, protect the reputation, and satisfy the customers of General Motors Products in a manner that demonstrates a caring attitude toward those customers. At the same time, Dealer relies upon General Motors to provide sales and service support and to continually strive to enhance the quality and competitiveness of its Products. This mutual dependence requires a spirit of cooperation, trust and confidence between General Motors and its dealers. To facilitate attainment of cooperation, trust and confidence, and to provide General Motors with the benefit of dealer advice regarding many decisions which affect dealer business operations, General Motors has established dealer councils, dealer advisory boards, and other mechanisms to obtain dealer input in the decision making process.

This Agreement (i) authorizes Dealer to sell and service General Motors Products and represent itself as a General Motors Dealer; (ii) states the terms under which Dealer and General Motors agree to do business together; (iii) states the responsibilities of Dealer and General Motors to each other and to customers; and (iv) reflects the mutual dependence of the parties in achieving their business objectives.

# ARTICLE 1.  APPOINTMENT AS AUTHORIZED DEALER

General Motors appoints Dealer as a non-exclusive dealer of General Motors Products. Dealer has the right to buy Products and the obligation to market and service those Products in accordance with this Agreement and related documents.

1

GM000312

# ARTICLE 2.  DEALER OPERATOR

This is a Personal Services Agreement, entered into in reliance on the qualifications, integrity and reputation of Dealer Operator identified in the Dealer Operator Addendum, and on Dealer's assurance that Dealer Operator will provide personal services by exercising full managerial authority over Dealership Operations.   Dealer Operator is responsible for developing and implementing policies, practices and procedures necessary for the Dealer to meet its obligations under this Agreement with respect to sales, service, customer satisfaction, facilities, and capitalization.    Dealer Operator will have an unencumbered ownership interest in Dealer of at least 15 percent at all times. A Dealer Operator must be a competent business person, an effective manager, must have demonstrated a caring attitude toward customers, and should have a successful record as a merchandiser of automotive products and services or otherwise have demonstrated the ability to manage a dealership. The experience necessary may vary with the potential represented by each dealer location. Although this Agreement is entered into in reliance on the personal services of the Dealer Operator, the Dealer entity specified in this Agreement is the only party to this Agreement with General Motors.

# ARTICLE 3.  DEALER INVESTOR

General Motors enters into this Agreement in reliance on the qualifications, integrity and reputation of dealer investor(s) identified in the Dealer Statement of Ownership. General Motors and Dealer agree each dealer investor will continue to own, both of record and beneficially, the percentage stated in the Dealer Statement of Ownership, unless a change is made in accordance with Article 12.

# ARTICLE 4.  AUTHORIZED LOCATIONS

### 4.1    Dealer Network Planning

Because  General  Motors  distributes  its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement. Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and General Motors all benefit.

To  maximize  the  effectiveness  of  its  dealer network, General Motors agrees to monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above.  Such marketing conditions  include  General  Motors  sales  and registration  performance,  present  and  future

2

GM000313

Case 1:18-cv-03658-VSB    Document 6    Filed 06/28/18    Page 37 of 122

demographic and economic considerations, competitive dealer networks, the ability of General Motors existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

### 4.2    Area of Primary Responsibility

Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the area designated in a Notice of Area of Primary Responsibility. The Area of Primary Responsibility is used by General Motors in assessing performance of dealers and the dealer network. General Motors retains the right to revise Dealer's Area of Primary Responsibility at General Motors sole discretion consistent with dealer network planning objectives. If General Motors determines that marketing conditions warrant a change in Dealer's Area of Primary Responsibility, it will advise Dealer in writing of the proposed change, the reasons for it, and will consider any information the Dealer submits. Dealer must submit such information in writing within thirty 30 days of receipt of notice of the proposed change. If requested by Dealer within the thirty days, General Motors will extend the time for an additional 30 days for Dealer to obtain and submit relevant information. If General Motors thereafter decides the change is warranted, it will issue a revised Notice of Area of Primary Responsibility.

### 4.3    Establishment of Additional Dealers

General Motors reserves the right to appoint additional dealers but General Motors will not exercise this right without first analyzing dealer network planning considerations with respect to the Line-Make under consideration. Prior to establishing an additional same Line-Make dealer within Dealer's Area of Primary Responsibility, General Motors will advise Dealer in writing and give Dealer thirty days to present relevant information before General Motors makes a final decision. If requested by Dealer within the thirty days, General Motors will extend the time for an additional thirty days for Dealer to obtain and submit relevant information. General Motors will advise Dealer of the final decision concerning the establishment of an additional dealer, which will be made solely by General Motors pursuant to its business judgment. Nothing in this Agreement is intended to require Dealer's consent to the establishment of an additional dealer, nor is this Agreement intended to give Dealer a right to object to the establishment of a different Line-Make.

The appointment of a dealer at or within three miles of a former dealership location as a replacement for the former dealer ("dealer replacement") or the relocation of an existing dealer point ("relocation") shall not be considered the establishment of an additional Dealer for purposes of this Article 4.3. General Motors shall not have any obligation to provide notice under Article 4 for a dealer replacement or relocation, and such events are within the sole discretion of General Motors pursuant to its business judgment.

3

GM000314

### 4.4     Facilities

#### 4.4.1     Location

Dealer agrees to conduct Dealership Operations only from the approved location(s) within its Area of Primary Responsibility. The Location and Premises Addendum identifies Dealer's approved location(s) and facilities ("Premises"). If more than one location is approved, Dealer agrees to conduct from each location only those Dealership Operations authorized in the Addendum for such location.

#### 4.4.2     Change in Location or Use of Premises

If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment.

Before General Motors requires any changes in Premises, it will consult with Dealer, indicate the rationale for the change, and solicit Dealer's views on the proposal. If, after such review with Dealer, General Motors determines a change in Premises or location is appropriate, the Dealer will be allowed a reasonable time to implement the change. Any such changes will be reflected in a new Location and Premises Addendum or other written agreement executed by Dealer and General Motors.

Nothing herein is intended to require the consent or approval of any dealer to a proposed relocation of any other dealer.

#### 4.4.3     Size

Dealer agrees to provide Premises at its approved location(s) that will promote the effective performance and conduct of Dealership Operations, and General Motors image and goodwill. Consistent with General Motors dealer network planning objectives and General Motors interest in maintaining the stability and viability of its dealers, Dealer agrees that its facilities will be sized in accordance with General Motors requirements for that location.

General Motors agrees to establish and maintain a clearly stated policy for determining reasonable dealer facility space requirements and to periodically re-evaluate those requirements to ensure that they continue to be reasonable.

#### 4.4.4     Dealership Image and Design

The appearance of Dealer's Premises is important to the image of Dealer and General Motors, and can affect the way customers perceive General Motors Products and its dealers generally. Dealer therefore agrees that its Premises will be properly equipped and maintained, clean, and appealing to customers. The interior and exterior retail environment and signs also will comply with any reasonable requirements General Motors may establish to promote and preserve the image of General Motors and its dealers.

General Motors will monitor developments in automotive and other retail industries to ensure that General Motors image and facility requirements are responsive to changes in the marketing environment.

4

General Motors will take into account existing economic and marketing conditions and consult with the appropriate dealer council in establishing such requirements.

#### 4.4.5   *Dealership Equipment*

Effective performance of Dealer's responsibilities under this Agreement requires that the dealership be reasonably equipped to communicate with customers and General Motors and to properly diagnose and service Products. Accordingly, Dealer agrees to provide for use in the Dealership Operations any equipment reasonably designated by General Motors as necessary for Dealer to perform effectively under this Agreement. General Motors will make such designations only after having consulted with the appropriate dealer council.

# ARTICLE 5.  DEALER'S RESPONSIBILITY TO PROMOTE, SELL, AND SERVICE PRODUCTS

#### 5.1   *Responsibility to Promote and Sell*

*5.1.1* Dealer agrees to effectively, ethically and lawfully sell and promote the purchase, lease and use of Products by consumers located in its Area of Primary Responsibility. To achieve this objective, Dealer agrees to:

(a) maintain an adequate staff of trained sales personnel;

(b) explain to Product purchasers the items which make up the purchase price and provide purchasers with itemized invoices;

(c) not charge customers for services for which Dealer is reimbursed by General Motors;

(d) include in customer orders only equipment or accessories requested by customer or required by law;

(e) ensure that the customer's purchase and delivery experience are satisfactory; and

(f) comply with the retail sales standards established by General Motors, as amended from time to time. General Motors will consult with the appropriate dealer council and the national dealer council before amending the retail sales standards.

If Dealer modifies or sells a modified new Motor Vehicle, or installs any equipment, accessory, recycled part or part not supplied by General Motors, or sells any non-General Motors service contract for a Motor Vehicle, Dealer will disclose this fact on the purchase order and bill of sale, indicating that the modification, equipment, accessory or part is not warranted by General Motors or, in the case of a service contract, the coverage is not provided by General Motors or an affiliate.

*5.1.2* Dealer located in the United States is authorized to sell new Motor Vehicles only to customers located in the United States. Dealer agrees that it will not sell new Motor Vehicles for resale or principal use outside the United States. Dealer also

5

GM000316

agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in the United States. For this section, United States includes the fifty states and the District of Columbia.

*5.1.3*   Dealer located in Guam, Puerto Rico or the US Virgin Islands is authorized to sell new Motor Vehicles only to customers located in Guam, Puerto Rico or the US Virgin Islands respectively. Dealer in Guam, Puerto Rico or the US Virgin Islands agrees that it will not sell new Motor Vehicles to customers located outside Guam, Puerto Rico or the US Virgin Islands respectively, or to customers for resale or principal use outside of Guam, Puerto Rico or the US Virgin Islands. Dealer agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in Guam, Puerto Rico or the US Virgin Islands respectively.

*5.1.4*   It is General Motors policy not to sell or allocate new Motor Vehicles to dealers for resale to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling Motor Vehicles. The dealer distribution organizations that General Motors has established in the United States, Guam, Puerto Rico and US Virgin Islands are best suited for the distribution of Motor Vehicles in the United States, Guam, Puerto Rico and the US Virgin Islands respectively, and are in the best position to arrange for the proper performance of Motor Vehicle warranty repairs, field actions and inspections, pre-delivery inspections, and ongoing maintenance and compliance with government requirements. Therefore, unless otherwise authorized in writing by General Motors, Dealer agrees that this Agreement authorizes Dealer to purchase Motor Vehicles only for resale to

customers for personal use or primary business use other than resale. Dealer is not authorized by this Agreement to directly or indirectly sell Motor Vehicles to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling of Motor Vehicles. Nothing in this Article 5.1.4 is intended to restrict Dealer from selling Motor Vehicles to other General Motors dealers of the same Line-Make in the same country or territory.

*5.1.5*   General Motors will conduct general advertising programs to promote the sale of Products for the mutual benefit of General Motors and Dealers. General Motors will make available to Dealer advertising and sales promotion materials from time to time and advise Dealer of any requirements or applicable charges.

*5.1.6*   Dealer agrees to advertise and conduct promotional activities that are lawful and enhance the reputation of Dealer, General Motors and its Products. Dealer will not advertise or conduct promotional activities in a misleading or unethical manner, or that is harmful to the reputation of Dealer, General Motors, or its Products.

*5.2*    **Responsibility to Service**

*5.2.1* Dealer agrees to maximize customer satisfaction by providing courteous, convenient, prompt, efficient and quality service to owners of Motor Vehicles, regardless of from whom the Vehicles were purchased. All service will be performed and administered in a professional manner and in accordance with all applicable laws and regulations, this Agreement, and the Service Policies and Procedures Manual, as amended from time to

GM000317

time. Dealer also will comply with the retail service standards established by General Motors, as amended from time to time. General Motors will consult with the appropriate dealer council and the national dealer council before amending the retail service standards.

*5.2.2* Dealer agrees to maintain an adequate service and parts organization as recommended by General Motors, including a competent, trained service and parts manager(s), trained service and parts personnel and, where service volume or other conditions make it advisable, a consumer relations manager.

*5.2.3* Dealer and General Motors will each provide the other with such information and assistance as may reasonably be requested by the other to facilitate compliance with applicable laws, regulations, investigations and orders relating to Products.

*5.2.4* To build and maintain consumer confidence in, and satisfaction with, Dealer and General Motors, Dealer will comply with General Motors procedures for the investigation and resolution of Product-related complaints.

*5.2.5* General Motors will make available to Dealer current service and parts manuals, bulletins, and technical data publications relating to Motor Vehicles.

*5.3*   *Customer Satisfaction*

Dealer and General Motors recognize that appropriate care for the customer will promote customer satisfaction with General Motors Products and its dealers, which is critically important to our current and future business success. Dealer therefore agrees to conduct its operations in a manner which will promote customer satisfaction with the purchase and ownership experience. General Motors agrees to provide Dealer with reasonable support to assist Dealer's attainment of customer satisfaction, but Dealer remains responsible for promoting and maintaining customer satisfaction at the dealership.

General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's purchase and delivery customer satisfaction and Dealer's service customer satisfaction. The report will compare Dealer's performance to other same Line-Make dealers in the Region. General Motors will provide a written explanation of the customer satisfaction review process to Dealer.

General Motors may revise the customer satisfaction evaluation process from time to time. General Motors will consult with the appropriate dealer council before making any changes.

*5.4*   *Business Planning*

General Motors has established a business planning process to assist dealers, although Dealer remains responsible for satisfying its performance obligations under the Agreement. Dealer agrees to prepare and implement a reasonable business plan if requested by General Motors. General Motors agrees to provide Dealer with information specific to its dealership, and

7

GM000318

if requested, to assist Dealer in its business planning as agreed upon by Dealer and General Motors.

### 5.5    Dealer Council

General Motors agrees to establish such dealer councils as appropriate to foster and maintain a positive business relationship between General Motors and its dealers, and to obtain dealer input in General Motors decision-making process. These councils may be established on a national, regional or local basis, and General Motors will consult with dealers in establishing or changing such dealer councils. These councils are intended to provide General Motors with the benefit of dealer advice regarding various decisions which affect dealership operations.

### 5.6    Electronic Communications, Data Interchange, and Electronic Transactions

To provide for effective and efficient communication, data interchange and electronic transactions between General Motors, its dealers, and its customers, General Motors may establish reasonable requirements for Dealer's acquisition and use of certain computer software, computer hardware, and systems in Dealership Operations, including but not limited to use involving or relating to the Internet. General Motors will take into consideration factors such as market conditions, competitive circumstances, and costs in establishing such reasonable requirements. Dealer agrees to comply with those requirements and all restrictions and limitations applicable to such computer software, computer hardware or systems. General Motors will consult with the appropriate dealer council in establishing such requirements, and such requirements shall be listed in

GM GlobalConnect under publications, or such other website(s) as General Motors may designate.

### 5.7    Exchange of Information, and the Handling of Customer Information

General Motors may provide Dealer from time to time certain customer information or other information or data. Dealer agrees to use such information or data only as designated by General Motors, and not to otherwise disclose such information or data without General Motors written permission, unless otherwise required by law. This restriction only applies to information and data provided by General Motors to its dealers, and does not apply to data or information Dealer obtains from its customers or other sources.

To protect the security and confidentiality of customer information Dealer shares with General Motors, General Motors implements and maintains technical, physical and administrative safeguards in accordance with the law. General Motors shall provide privacy statements to its customers that explain how General Motors handles customer personal information, including that it shares customer personal information with General Motors affiliates and dealers as permitted by law. General Motors privacy statement(s) for U.S. consumers shall be made available at www.gm.com, or such other website(s) as General Motors may designate.

To protect the security and confidentiality of customer information General Motors shares with Dealer, Dealer agrees to implement and maintain technical, physical and administrative safeguards in accordance with the law. Further, Dealer agrees to familiarize dealership employees that handle or have

8

access to customer information received from General Motors with General Motors privacy requirements, and the GM privacy statements found at www.gm.com, or such other website(s) as GM may designate. Dealer shall provide privacy statements to its customers that explain how the dealership handles customer personal information, including that it shares customer personal information with non-affiliated third parties as permitted by law. Dealer's privacy statement shall be made available at the dealership and at any Dealer websites that collect customer personal information.

# ARTICLE 6.  SALE OF PRODUCTS TO DEALERS

### 6.1    Sale of Motor Vehicles to Dealer

General Motors will periodically furnish Dealer one or more Motor Vehicle Addenda specifying the current model types or series of new Motor Vehicles which Dealer may purchase under this Agreement. General Motors may change a Motor Vehicle Addendum by furnishing a superseding one, or may cancel an Addendum at any time.

General Motors will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers, including component availability and available production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations, and other conditions beyond the control of General Motors. General Motors reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final. Upon written request, General Motors will advise Dealer of the total number of new Motor Vehicles, by allocation group, sold to dealers in Dealer's Market Area or Region during the preceding month.

### 6.2    Sale of Parts and Accessories to Dealer

New, reconditioned or remanufactured automotive parts and accessories marketed by General Motors and listed in current Dealer Parts and Accessories Price Schedules or supplements furnished to Dealer are called Parts and Accessories. Orders for Parts and Accessories will be submitted and processed according to written or electronic procedures established by General Motors or other designated suppliers.

### 6.3    Prices and Other Terms of Sale
#### 6.3.1    Motor Vehicles

Prices, destination charges, and other terms of sale applicable to purchases of new Motor Vehicles will be those established according to Vehicle Terms of Sale Bulletins furnished periodically to Dealer.

Prices, destination charges, and other terms of sale applicable to any Motor Vehicle may be changed at any time. Except as otherwise provided in writing or electronically, changes apply to Motor Vehicles not shipped to Dealer at the time the changes are made effective. Dealer will receive written or electronic notice of any price increase before any Motor Vehicle to which such increase applies is shipped, except for initial prices for a new model year or for any new model or body type. Dealer has the right to cancel or

9

GM000320

modify the affected orders by delivering written or electronic notice to General Motors within 10 days after its receipt of the price increase notice in accordance with procedures established by General Motors.

If General Motors offers any incentives to customers or dealers, and payment is conditioned upon the purchase or lease of a new Motor Vehicle, Dealer agrees to comply with the then current applicable policies and procedures in the General Motors Dealer Sales Allowance And Incentive Manual, as amended from time to time.

### 6.3.2    Parts and Accessories

Prices and other terms of sale applicable to Parts and Accessories are established by General Motors according to the Parts and Accessories Terms of Sale Bulletin furnished to Dealer. Prices and other terms of sale applicable to Parts and Accessories may be changed by General Motors at any time.

### 6.4    Inventory

#### 6.4.1    Motor Vehicle Inventory

Dealer recognizes that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory. Accordingly, Dealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility.

#### 6.4.2    Parts and Accessories

Dealer agrees to stock sufficient Parts and Accessories made available by General Motors to perform warranty repairs and policy adjustments and meet customer demand.

### 6.5    Warranties on Products

General Motors warrants new Motor Vehicles and Parts and Accessories (Products) as explained in documents provided with the Products or in the Service Policies and Procedures Manual.

EXCEPT AS OTHERWISE PROVIDED BY LAW, THE WRITTEN GENERAL MOTORS WARRANTIES ARE THE ONLY WARRANTIES APPLICABLE TO PRODUCTS. WITH RESPECT TO DEALERS, SUCH WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES OR LIABILITIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY LIABILITY FOR COMMERCIAL LOSSES BASED UPON NEGLIGENCE OR MANUFACTURER'S STRICT LIABILITY EXCEPT AS MAY BE PROVIDED UNDER AN ESTABLISHED GENERAL MOTORS PROGRAM OR PROCEDURE, GENERAL MOTORS NEITHER ASSUMES NOR AUTHORIZES ANYONE TO ASSUME FOR IT ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH PRODUCTS, AND GENERAL MOTORS MAXIMUM LIABILITY IS TO REPAIR OR REPLACE THE PRODUCT.

GM000321

# ARTICLE 7.  SERVICE OF PRODUCTS

### 7.1    *Service for Which General Motors Pays*

#### 7.1.1    *New Motor Vehicle Pre-Delivery Inspections and Adjustments*

Because new vehicle delivery condition is critical to customer satisfaction, Dealer agrees to perform specified pre-delivery inspections and adjustments on each new Motor Vehicle and verify completion according to procedures identified in the Service Policies and Procedures Manual.

#### 7.1.2    *Warranty and Special Policy Repairs*

Dealer agrees to perform (i) required warranty repairs on each qualified Motor Vehicle at the time of pre-delivery service and when requested by owner, and (ii) special policy repairs approved by General Motors. When the vehicle is returned to the owner, Dealer will provide owner a copy and explanation of the repair document reflecting all services performed.

#### 7.1.3    *Field Actions and Corrections*

General Motors will notify Dealer of suspected unsatisfactory conditions on Products, issue field action instructions, and make available a system that Dealer will use to check if a Product is subject to a field action. Dealer agrees to inspect and correct suspected unsatisfactory conditions on Products as instructed. For new and used Motor Vehicles in its inventory and for vehicles in its service facility, Dealer agrees to check the system for open field actions and to complete applicable field action inspections and corrections as instructed.

General Motors may ship, and Dealer agrees to accept, unordered parts and materials required for product field actions. Upon product field action completion, Dealer will receive credit for excess parts and materials so shipped if they are returned or disposed of in accordance with instructions from General Motors.

#### 7.1.4    *Payment for Pre-Delivery Adjustments, Warranty, Field Action and Transportation Damage Work*

For Dealer's performance of services, pre-delivery inspections and adjustments, warranty repairs, special policy repairs, field action inspections and corrections, and transportation damage repairs, General Motors will provide or pay Dealer for the Parts and other materials required and will pay Dealer a reasonable amount for labor. Payment will be made according to policies in the Service Policies and Procedures Manual. Dealer will not impose any charge for such service on owners or users except where a deductible or pro-rata charge applies.

### 7.2    *Parts, Accessories, and Body Repairs*

#### 7.2.1    *Warranty and Policy Repairs*

Dealer agrees to use only genuine GM or General Motors approved Parts and Accessories in performing warranty repairs, special policy repairs, and any other repairs paid for by General Motors, in accordance with the applicable provisions of the Service Policies and Procedures Manual.

GM000322

#### 7.2.2 Representations and Disclosures as to Parts and Accessories

In servicing vehicles marketed by General Motors, Dealer agrees to disclose the use of recycled and non-General Motors parts and accessories as set forth in Article 5. 1. 1.

#### 7.2.3 Body Repairs

Dealer agrees to provide quality body repair service for Motor Vehicles. Dealer can provide this service through its own body shop, or by arrangement with an alternate repair establishment approved by General Motors.

#### 7.2.4 Tools and Equipment

Dealer agrees to provide and maintain on Dealership Premises essential service tools as required by General Motors, and such other tools and equipment as reasonably necessary to fulfill its responsibilities to properly diagnose and service Products. Dealer also agrees to allow General Motors or its designated representative to survey or inspect Dealer's tools and equipment to ensure that they are in good repair and proper calibration to enable Dealer to meet its service responsibilities. In the event a dispute arises from such a survey or inspection, General Motors personnel agree to discuss the matter with the Dealer in order to resolve the dispute.

## ARTICLE 8.  TRAINING

Properly trained personnel are essential to the success of Dealer and General Motors, and to providing customers with a satisfactory sales and service experience. General Motors agrees to make available or recommend to Dealer product, sales, service, parts, accounting, business management, finance and insurance, and systems training courses for Dealer personnel. General Motors will make such training available through training sites, online learning via internet access and other appropriate mediums as determined by General Motors. General Motors will assist Dealer in determining training requirements and periodically will require that Dealer have personnel attend or participate in specific courses held as conveniently as practicable.

Dealer agrees to comply with any such reasonable training requirements and pay any specified training fees and other charges that may apply.   Specific minimum training requirements will be shared with dealers either via direct communications or included in the Customer Assistance, Training, Tools and TAC Policy Manual. General Motors will make available personnel to advise and counsel Dealer personnel on sales, service, parts and accessories, and related subjects.

General Motors will consult with the appropriate dealer council prior to determining the training courses or programs from which an individual Dealer's requirements under this Article may be established.

GM000323

# ARTICLE 9.  REVIEW OF DEALER'S SALES  PERFORMANCE

General Motors willingness to enter into this Agreement is based in part on Dealer's commitment to effectively sell and promote the purchase, lease and use of Products in Dealer's Area of Primary Responsibility. The success of General Motors and Dealer depends to a substantial degree on Dealer taking advantage of available sales opportunities.

Given this Dealer commitment, General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's sales performance. The report will compare Dealer's retail sales to retail sales opportunities by segment in Dealer's Area of Primary Responsibility or Area of Geographical Sales and Service Advantage, whichever is applicable. General Motors will provide a written explanation of the sales review process to Dealer. Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100. If Dealer's Retail Sales Index is less than 100, Dealer's sales performance will be rated as provided in the General Motors Sales Evaluation process. General Motors expects Dealer to pursue available sales opportunities exceeding this standard. Additionally, General Motors expectations of its sales and registration performance for a Line-Make in a particular area may exceed this standard for individual dealer compliance.

In addition to the Retail Sales Index, General Motors will consider any other relevant factors in deciding whether to proceed under the provisions of Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities. General Motors will only pursue its rights under Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities if General Motors determines that Dealer has materially breached its sales performance obligations under this Dealer Agreement.

General Motors may modify the sales evaluation process from time to time and will consult with the appropriate dealer council before adopting such modifications.

# ARTICLE 10.  CAPITALIZATION

### 10.1    Net Working Capital

The Capital Standard Addendum reflects the minimum net working capital necessary for Dealer to effectively conduct Dealership Operations. Dealer agrees to maintain at least this level of net working capital. General Motors will issue a new Addendum if changes in operating conditions or General Motors guidelines indicate capital needs have changed materially.

### 10.2    Wholesale Floorplan

To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments, Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors. The amount of the line of credit will be sufficient for Dealer to meet its obligations under Article 6.4.

13

GM000324

# ARTICLE 11.  ACCOUNTS AND RECORDS

### 11.1    *Uniform Accounting System*

A uniform accounting system facilitates an evaluation of Dealer business management practices and the impact of General Motors policies and practices. General Motors therefore agrees to maintain, and Dealer agrees to use and maintain records in accordance with a uniform accounting system set forth in an accounting manual furnished to Dealer. Dealer further agrees to submit to General Motors data in a manner specified by General Motors and on a timely basis.

### 11.2    *Submission of Accurate Applications and Information*

Dealer also agrees to timely submit true and accurate applications or claims for payments, discounts or allowances; true and correct orders for Products and reports of sale and delivery; and any other reports or statements required by General Motors, in the manner specified by General Motors, and to retain such records for at least two years.

### 11.3    *Examination of Accounts and Records*

Dealer agrees to permit any designated representative of General Motors to access, examine, audit, and take copies of any of the accounts and records Dealer is to maintain under the accounting manual and this Agreement. Dealer agrees to make such accounts and records readily available at its facilities during regular business hours. General Motors agrees to furnish Dealer with a list of any reproduced records.

### 11.4    *Confidentiality of Dealer Data*

General Motors agrees not to furnish any personal or financial data submitted to it by Dealer to any non-affiliated entity unless authorized by Dealer, required by law, or in connection with judicial or administrative proceedings, or to proceedings under the Dispute Resolution Process.

# ARTICLE 12.  CHANGES IN MANAGEMENT AND OWNERSHIP

The parties recognize that customers and authorized dealers, as well as shareholders and employees of General Motors, have a vital interest in the continued success and efficient operation of the General Motors dealer network. Accordingly, General Motors has the responsibility of continuing to administer the network to ensure that dealers are owned and operated by qualified persons able to meet the requirements of this Agreement.

### 12.1    *Succession   Rights   Upon   Death or Incapacity*

#### 12.1.1   *Successor Addendum*

Dealer can apply for a Successor Addendum designating a proposed dealer operator to be established in the event of the death or incapacity of the approved Dealer Operator. General Motors will execute the Addendum provided Dealer is meeting its obligations under this Agreement and under any

14

GM000325

Dealer Agreement which Dealer may have with General Motors for the conduct of Dealership Operations at the approved location(s); and the proposed dealer operator is, and will continue to be, employed full-time by Dealer or a comparable automotive dealership, and is already qualified or is being trained to qualify as a dealer operator.

Upon expiration of this Agreement, General Motors will, upon Dealer's request, execute a new successor addendum provided a new and superseding dealer agreement is executed with Dealer, and Dealer, the proposed dealer operator and dealer investors are then qualified as described above.

### 12.1.2   Absence of Successor Addendum

In the event of the death or incapacity of Dealer Operator, and Dealer and General Motors have not executed a Successor Addendum, Dealer will propose a successor dealer operator to continue the operations identified in this Agreement.

### 12.1.3   Successor Dealer Operator Requirements

General Motors will accept a proposal by Dealer to appoint a successor dealer operator under Article 12.1, provided:

(a) the proposed successor dealer operator is qualified and ready to meet the requirements of the Dealer Agreement at the approved location(s).

(b) General Motors approves all proposed investors not previously approved for the existing Dealership Operations.

(c) all outstanding monetary obligations of Dealer to General Motors have been satisfied.

### 12.1.4   Term of Dealer Agreement

Upon the appointment of a successor dealer operator, the term of the existing Dealer Agreement will remain unchanged.

### 12.1.5   Notice of Decision

Dealer will be notified in writing of the decision on a proposal to establish a successor dealer operator submitted under Article 12.1 within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors.

### 12.1.6  Cancellation of Addendum

Dealer may cancel an executed Successor Addendum at any time prior to the death of a Dealer Operator or the incapacity of Dealer Operator. General Motors may cancel an executed Successor Addendum only if the proposed dealer operator is no longer qualified under Article 12. 1. 1.

### 12.2   Other Changes in Ownership or Management

If Dealer proposes a change in Dealer Operator, a change in ownership, a change in Executive Manager, or a transfer of the dealership business or its principal assets, General Motors will consider Dealer's proposal and not unreasonably refuse to approve it, subject to the following:

*12.2.1* Dealer agrees to give General Motors prior written notice of any proposed change or transfer described above. Dealer understands that if any such change is made prior to General Motors approval of

15

GM000326

the proposal, termination of this Agreement will be warranted and General Motors will have no further obligation to consider Dealer's proposal.

**12.2.2**  General Motors agrees to consider Dealer's proposal, taking into account factors such as (a) the personal, business, and financial qualifications of the proposed dealer operator and investors, and (b) whether the proposed change is likely to result in a successful dealership operation with acceptable management, capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction.

**12.2.3**  General Motors will notify Dealer in writing of General Motors decision on Dealer's proposal within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors. If General Motors disagrees with the proposal, it will specify its reasons. General Motors may request that Dealer submit such applications and information in writing or electronically.

**12.2.4**  Any material change in Dealer's proposal, including change in price, facilities, capitalization, proposed investors, or dealer operator, will be considered a new proposal, and the time period for General Motors to respond shall recommence.

**12.2.5**  General Motors prior written approval is not required for a transfer of equity ownership or beneficial interest to an individual that is (a) less than ten percent in a calendar year, and (b) between existing dealer owners previously approved by General Motors where there is no change in

majority ownership or voting control. Dealer agrees to notify General Motors within 30 days of the date of the change and to execute a new Dealer Statement of Ownership.

**12.2.6**  General Motors is not obligated to approve any proposed changes in management or ownership under this Article unless Dealer makes arrangements acceptable to General Motors to satisfy any indebtedness of Dealer to General Motors and other commitments of Dealer to General Motors.

**12.3    Right of First Refusal to Purchase**

**12.3.1    Creation and Coverage**

If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer. If General Motors chooses to exercise this right, it will do so in its written response to Dealer's proposal. General Motors will have a reasonable opportunity to inspect the assets, including real estate, and corporate records before making its decision.

**12.3.2    Purchase Price and Other Terms of Sale**

**(a)    Bona Fide Agreement**

If Dealer has entered into a bona fide written buy/sell agreement, the purchase price and other terms of sale will be those set forth in such agreement and any related documents, unless Dealer and General Motors agree to other terms.

Upon General Motors request, Dealer agrees to provide all documents relating to the proposed

16

GM000327

transfer. If Dealer refuses to provide such documentation or state in writing that such documents do not exist, it will be presumed that the agreement is not bona fide.

### (b) Absence of Bona Fide Agreement

In the absence of a bona fide written buy/sell agreement, the purchase price of the dealership assets or stock and such other rights as proposed to be transferred will be determined by good faith negotiations by Dealer and General Motors. If agreement cannot be reached within a reasonable time, the price and other terms of sale will be established by arbitration according to the rules of the American Arbitration Association.

### 12.3.3   Consummation

Dealer agrees to transfer the property by Warranty Deed, where possible, conveying marketable title free and clear of liens and encumbrances. The Warranty Deed will be in proper form for recording and Dealer will deliver complete possession of the property when the Deed is delivered. Dealer will also furnish copies of any easements, licenses or other documents affecting the property and assign any permits or licenses necessary for the conduct of Dealership Operations.

### 12.3.4   Assignment

General Motors rights under this section may be assigned to any third party ("Assignee"). If there is an assignment, General Motors will guarantee full payment of the purchase price by the Assignee. General Motors shall have the opportunity to discuss the terms of the buy/sell agreement with the potential Assignee(s).

General Motors rights under this Article are binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets or stock and such other rights as proposed to be transferred.

### 12.3.5   Transfer Involving Family Members and Dealer Management

When the proposed change of ownership involves a transfer solely to a member or members of the Dealer Operator's or investor's immediate family, or to a qualifying member of Dealer's Management, and such member or members meet General Motors' qualification requirements under Article 12.2, General Motors right of first refusal will not apply. An "immediate family member" shall be the spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of the dealer investor. A "qualifying member of Dealer's Management" shall be an individual who has been employed by Dealer for at least two years and otherwise qualifies as a dealer operator.

### 12.3.6   Expenses

If General Motors exercises its right of first refusal, General Motors agrees to pay the proposed owner the reasonable expenses, including reasonable attorney fees, that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, and that are incurred by the proposed owner in negotiating and implementing the contract for the proposed change in Dealer ownership before General Motors gives notice of its exercise of its right of first refusal. The proposed owner must provide a reasonable accounting and documentation of such expenses to receive such reimbursement.

17

GM000328

# ARTICLE 13.  BREACHES AND OPPORTUNITY TO REMEDY

### 13.1    *Certain Acts or Events*

The following acts or events, which are within the control of Dealer or originate from action taken by Dealer or its management or investors, are material breaches of this Agreement. If General Motors learns that any of the acts or events has occurred, it may notify the Dealer in writing. If notified, Dealer will be given the opportunity to respond in writing within 30 days of receipt of the notice, explaining or correcting the situation to General Motors satisfaction.

### 13.1.1 The removal, resignation, withdrawal, or elimination from Dealer for any reason of any Dealer Operator or dealer investor without General Motors prior written approval.

### 13.1.2 Any attempted or actual sale, transfer, or assignment by Dealer of this Agreement or any of the rights granted Dealer hereunder, or any attempted or actual transfer, assignment or delegation by Dealer of any of the responsibilities assumed by it under this Agreement contrary to the terms of this Agreement.

### 13.1.3 Any change, whether voluntary or involuntary, in the record or beneficial ownership of Dealer as set forth in the Dealer Statement of Ownership furnished by Dealer, unless permitted by Article 12.2.5 or pursuant to General Motors written approval.

### 13.1.4 Any undertaking by Dealer or any of its investors to conduct, either directly or indirectly,

any of the Dealership Operations at any un-approved location.

### 13.1.5 Any sale, transfer, relinquishment, discontinuance, or change of use by Dealer of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without General Motors prior written approval.

### 13.1.6 Any dispute among the dealer investors or management personnel of Dealer which, in General Motors judgment, may adversely affect the Dealership Operations or the interests of Dealer or General Motors.

### 13.1.7 Refusal by Dealer to timely furnish sales, service or financial information and related supporting data, or to permit General Motors examination or audit of Dealer's accounts and records.

### 13.1.8 A finding by a government agency or court of original jurisdiction or a settlement arising from charges that Dealer, Dealer Operator, or a predecessor of Dealer owned or controlled by the same person, had committed an unfair or deceptive business practice which, in General Motors judgment, may adversely affect the reputation or interests of Dealer or General Motors.

### 13.1.9 Willful failure of Dealer to comply with the provisions of any laws or regulations relating to Dealership Operations.

GM000329

*13.1.10* Submission by Dealer of false applications or reports, including false orders for Products or reports of delivery or transfer of Products.

*13.1.11* Failure of Dealer to maintain the line of credit required by Article 10.

*13.1.12* Failure of Dealer to timely pay its obligations to General Motors.

*13.1.13* Refusal by Dealer to permit General Motors or any designated representative of General Motors to access, examine, audit, or take copies of any of the accounts or records Dealer is to maintain under the accounting manual and this Agreement.

*13.1.14* Any other material breach of Dealer's obligations under this Agreement not otherwise identified in this Article 13 or in Article 14, or any other fraudulent conduct not specifically mentioned above.

If Dealer's response demonstrates that the breach has been corrected, or otherwise explains the circumstances to General Motors satisfaction, then General Motors shall confirm this fact in writing to Dealer. If, however, Dealer's response does not demonstrate that the breach has been corrected, or explain the circumstances to General Motors satisfaction, termination is warranted and General Motors may terminate this Agreement upon written notice to Dealer. Termination will be effective 60 days following Dealer's receipt of the notice.

**13.2    *Failure of Performance by Dealer***

If General Motors determines that Dealer's Premises are not acceptable, or that Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, General Motors will review such failure with Dealer.

As soon as practical thereafter, General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during which Dealer will have the opportunity to correct the failure.

If Dealer does correct the failure by the expiration of the period, General Motors will so advise the Dealer in writing. If, however, Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice.

# ARTICLE 14.  TERMINATION OF AGREEMENT

**14.1    *By Dealer***

Dealer has the right to terminate this Agreement without cause at any time upon written notice to General Motors. Termination will be effective 30 days after General Motors receipt of the notice, unless otherwise mutually agreed in writing.

**14.2    *By Agreement***

This Agreement may be terminated at any time by written agreement between General Motors and Dealer. Termination assistance will apply only as specified in the written termination agreement.

GM000330

### 14.3    Failure to be Licensed

If General Motors or Dealer fails to secure or maintain any license required for the performance of obligations under this Agreement or such license is suspended or revoked, either party may terminate this Agreement by giving the other party fifteen days written notice. Dealer may only conduct Dealership Operations if permitted by law.

### 14.4    Death or Incapacity of Dealer Operator

Because this is a Personal Services Agreement, General Motors may terminate this Agreement by written notice to Dealer upon the death of the Dealer Operator or if Dealer Operator is so physically or mentally incapacitated that the Dealer Operator is unable to actively exercise full managerial authority. The effective date of termination will be stated in such written notice and will be not less than three months after receipt of such notice.  Prior to issuing a written notice of termination under Article 14.4, General Motors will provide Dealer with sixty days to submit a proposal for a replacement dealer operator by submitting the application forms and such other information reasonably requested by General Motors. General Motors will evaluate the candidate's qualification requirements under Article 12.2.

### 14.5    Acts or Events

If General Motors learns that any of the following has occurred, it may terminate this Agreement by giving Dealer written notice of termination. Termination will be effective on the date specified in the notice.

14.5.1    Conviction in a court of original jurisdiction of Dealer, or a predecessor of Dealer

owned or controlled by the same person, or any Dealer Operator or Dealer Investor of any felony.

14.5.2    Insolvency of Dealer; or filing by or against Dealer of a petition in bankruptcy; or filing of a proceeding for the appointment of a receiver or trustee for Dealer, provided such filing or appointment is not dismissed or vacated within thirty days; or execution by Dealer of an assignment for the benefit of creditors or any foreclosure or other due process of law whereby a third party acquires rights to the operation, ownership or assets of Dealer.

14.5.3    Failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days.

14.5.4    Any misrepresentation to General Motors by Dealer or by any Dealer Operator or Dealer Investor in applying for this Agreement, or in identifying the Dealer Operator, or record or beneficial ownership of Dealer.

14.5.5    Submission by Dealer of false applications or claims for any payment, credit, discount, or allowance, including false applications in connection with incentive activities, where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment.

Termination for failure to correct other breaches will be according to the procedures outlined in Article 13.

GM000331

**14.6    Reliance on Any Applicable Termination Provision**

The terminating party may select the provision under which it elects to terminate without reference in its notice to any other provision that may also be applicable. The terminating party subsequently also may assert other grounds for termination.

**14.7    Transactions After Termination**

**14.7.1    Effect on Orders**

If Dealer and General Motors do not enter into a new Dealer Agreement when this Agreement expires or is terminated, all of Dealer's outstanding orders for Products will be automatically canceled except as provided in this Article 14.7.

Termination of this Agreement will not release Dealer or General Motors from the obligation to pay any amounts owing the other, nor release Dealer from the obligation to pay for Special Vehicles if General Motors has begun processing such orders prior to the effective date of termination.

**14.7.2    Termination Deliveries**

If this Agreement is voluntarily terminated by Dealer or expires or is terminated because of the death or incapacity of a Dealer Operator, without a termination or expiration deferral, General Motors will use its best efforts consistent with its distribution procedures to furnish Dealer with Motor Vehicles to fill Dealer's bona fide retail sold orders with customers as of the effective date of termination or expiration, not to exceed, however, the total number of Motor Vehicles invoiced to Dealer for retail sale during the three months immediately preceding the effective date of termination.

**14.7.3    Effect of Transactions After Termination**

Neither the sale of Products to Dealer nor any other act by General Motors or Dealer after termination of this Agreement will be construed as a waiver of the termination.

# ARTICLE 15. TERMINATION ASSISTANCE

**15.1    Deferral of Effective Date**

If this Agreement is scheduled to expire or terminate because of the death or incapacity of a Dealer Operator and Dealer requests an extension of the effective date of expiration or termination thirty days prior to such date, General Motors will defer the effective date for up to a total of eighteen months after such death or incapacity occurs to assist Dealer in winding up its Dealership Operations.

**15.2    Purchase of Personal Property**

**15.2.1    General Motors Obligations**

If this Agreement: a) expires or is terminated by Dealer, and General Motors does not offer Dealer or a replacement dealer a new dealer agreement, or b) is terminated by General Motors for cause under the Dealer Agreement, General Motors will offer to purchase the following items of personal property

21

(herein called Eligible Items) from Dealer at the prices indicated:

(a) New and unused Motor Vehicles of the current model year purchased by Dealer from General Motors, and of the previous model year if purchased by Dealer from General Motors within one hundred twenty days before the effective date of termination, at a price equal to the net prices and charges that were paid to General Motors;

(b) Any signs owned by Dealer of a type recommended in writing by General Motors and bearing any Marks at a price agreed upon by General Motors and Dealer. If General Motors and Dealer cannot agree on a price, they will select a third party who will set the price;

(c) Any essential tools recommended by General Motors and designed specifically for service of Motor Vehicles that General Motors offered for sale during the three years preceding termination at prices established in accordance with the applicable pricing formula in the Service Policies and Procedures Manual; and

(d) Unused and undamaged Parts and Accessories that (i) are still in the original, re-salable merchandising packages and in unbroken lots (in the case of sheet metal, a comparable substitute for the original package may be used); (ii) are listed for sale in the then current Dealer Parts and Accessories Price Schedules (except those items marked **NOT ELIGIBLE** Parts and Accessories); and (iii) were purchased by Dealer either directly from General Motors or from an outgoing dealer as a part of Dealer's initial Parts and Accessories inventory. Prices will be those dealer prices in effect at the time General Motors receives the Parts and Accessories, less any applicable allowances whether or not any such allowances were made to Dealer when Dealer

purchased the Parts and Accessories. In addition, an allowance of five percent of dealer price for packing costs and reimbursement for transportation charges to the destination specified by General Motors will be credited to Dealer's account.

### 15.2.2 Dealer's Responsibilities

General Motors obligation to purchase Eligible Items is subject to Dealer fulfilling its responsibility under this subsection.

Within fifteen days following the effective date of termination or expiration of this Agreement, Dealer will furnish General Motors with a list of vehicle identification numbers and such other information as General Motors may request pertaining to eligible Motor Vehicles. Dealer will deliver the eligible Motor Vehicles to a destination determined by General Motors that will be in a reasonable proximity to Dealer's Premises.

Within two months following the effective date of termination or expiration of this Agreement, Dealer will mail or deliver to General Motors a complete and separate list of each of the Eligible Items other than Motor Vehicles. Dealer will retain the Eligible Items until receipt of written shipping instructions from General Motors. Within thirty days after receipt of instructions, Dealer will ship the Eligible Items, transportation charges prepaid, to the destinations specified in the instructions.

Dealer will take action and execute and deliver such instruments as necessary to (a) convey to General Motors good and marketable title to all Eligible Items to be purchased, (b) comply with the requirements of any applicable state law relating to bulk sales or

GM000333

transfer, and (c) satisfy and discharge any liens or encumbrances on Eligible Items prior to their delivery to General Motors.

### 15.2.3    Payment

Subject to Article 17.10, General Motors will pay for the Eligible Items as soon as practicable following their delivery to the specified destinations. Payment may be made directly to anyone having a security or ownership interest in the Eligible Items.

If General Motors has not paid Dealer for the Eligible Items within two months after delivery, and if Dealer has fulfilled its termination obligations under this Agreement, General Motors will, at Dealer's written request, estimate the purchase price of the unpaid Eligible Items and all other amounts owed Dealer by General Motors. After deducting the amounts estimated to be owing General Motors and its subsidiaries by Dealer, General Motors will pay Dealer 75 percent of the net amount owed Dealer and will pay the balance, if any, as soon as practicable thereafter.

### 15.2.4    Replacement Dealer

If Dealer intends to terminate its Dealer Agreement and General Motors has approved a replacement dealer, the Dealer or replacement dealer may submit electronically to General Motors prior to the closing a listing of the Dealer's parts inventory, and General Motors will advise the Dealer or replacement dealer within thirty days what parts General Motors is willing to repurchase under General Motors policies and procedures then in effect upon Dealer's termination of its Dealer Agreement. General Motors will assist the replacement dealer in establishing an appropriate Motor Vehicle inventory as provided in Article 6.4.1.

### 15.3    Assistance on Premises

#### 15.3.1    General Motors Obligation

Subject to Article 17.10, General Motors agrees to give Dealer assistance in disposing of the Premises as provided below if (i) this Agreement expires for any reason or is terminated by General Motors under Articles 13.2 or 14.4 and (ii) Dealer is not offered a new Dealer Agreement. Such assistance shall be given only on Premises that are described in the Location and Premises Addendum and only if:

(a) they are used solely for Dealership Operations (or similar dealership operations under other agreements with    General Motors which will be terminated simultaneously with this Agreement); and

(b) they are not substantially in excess of space requirements at the time of termination or, if they are substantially in excess, they became excessive because of a reduction in the requirements applicable to Dealer's facilities.

Any Dealer request for such assistance must be in writing and received by General Motors within thirty days of the expiration or termination of this Agreement.

Premises that consist of more than one parcel of property or more than one building, each of which is separately usable, distinct and apart from the whole or any other part with appropriate ingress or egress, shall be considered separately under this Article 15.3.

#### 15.3.2    Owned Premises

General Motors will provide assistance on owned Premises by either (a) locating a purchaser who will offer to purchase the Premises at a reasonable price, or (b) locating a lessee who will offer to lease the Premises. If General Motors does not locate a

23

GM000334

purchaser or lessee within a reasonable time, General Motors will itself either purchase or, at its option, lease the Premises for a reasonable term at a reasonable rent. If the cause of termination or expiration is a death or the incapacity of the Dealer Operator, General Motors may instead pay Dealer a sum equal to a reasonable rent for a period of twelve months immediately following the effective date of termination or expiration of this Agreement.

### 15.3.3   Leased Premises

General Motors will provide assistance on leased Premises by either:

(a) locating a tenant(s), satisfactory to lessor, who will sublet for the balance of the lease or assume it; or

(b) arranging with the lessor for the cancellation of the lease without penalty to Dealer; or

(c) reimbursing Dealer for the lesser of the rent specified in the lease or settlement agreement or a reasonable rent for a period equal to the lesser of twelve months from the effective date or termination or expiration of the balance of the lease term.

Upon request, Dealer will use its best efforts to effect a settlement of the lease with the lessor subject to General Motors prior approval of the terms. General Motors is not obligated to reimburse Dealer for rent for any month during which the Premises are occupied by Dealer or anyone else, after the first month following the effective date of termination or expiration.

### 15.3.4   Rent and Price

General Motors and Dealer will fix the amount of a reasonable rent and a reasonable price for the Premises by agreement at the time Dealer requests assistance. The factors to be considered in fixing those amounts are:

(a) the adequacy and desirability of the Premises for a dealership operation; and

(b) the fair market value of the Premises. If General Motors and Dealer cannot agree, the fair market value will be determined by the median appraisal of three qualified real estate appraisers, of whom Dealer and General Motors will each select one and the two selected will select the third. The cost of appraisals will be shared equally by Dealer and General Motors.

### 15.3.5   Limitations on Obligation to Provide Assistance

General Motors will not be obligated to provide assistance on Premises if Dealer:

(a) fails to accept a bona fide offer from a prospective purchaser, sub-lessee or assignee;

(b) refuses to execute a settlement agreement with the lessor if the agreement would be without cost to Dealer;

(c) refuses to use its best efforts to effect a settlement when requested by General Motors; or

(d) refuses to permit General Motors to examine Dealer's books and records if necessary to verify claims of Dealer under this Article.

Any amount payable by General Motors as rental reimbursement or reasonable rent shall be proportionately reduced if the Premises are leased or sold to another party during the period for which such amount is payable. Payment of rental reimbursement or reasonable rent is waived by Dealer if it does not file its claim therefor within two months after the expiration of the period covered by the payment. Upon request, Dealer will support its claim with satisfactory evidence of its accuracy and reasonableness.

GM000335

# ARTICLE 16.  DISPUTE RESOLUTION PROCESS

Dealer and General Motors recognize that it is desirable to resolve disputes in a fair, prompt, and cost efficient manner. Therefore, except for the matters specified below, and except as otherwise specifically agreed upon in writing between Dealer and General Motors, Dealer and General Motors agree to mediate any dispute arising under this Agreement or applicable law using the General Motors Dispute Resolution Process then in effect, a copy of which has been provided to Dealer, before using other remedies available under federal, state or local law. The matters ineligible for mediation include: (i) terminations due to insolvency, a dealer's failure to conduct customary sales and service operations during customary business hours for at least seven consecutive business days, license revocation, fraud or felony convictions, (ii) disputes requiring participation by a third party who does not agree to participate in the mediation, and (iii) disputes of General Motors Policies or Procedures as applied to dealers generally. Dealer or General Motors may file simultaneously with a court or administrative agency if necessary to retain its rights under applicable law. Mediation under the General Motors Dispute Resolution Process is mandatory, but mediation is not binding on the parties unless the parties agree upon a solution. If a dispute is not resolved through mediation, Dealer and General Motors may agree to resolve this dispute through voluntary binding arbitration available under the General Motors Dispute Resolution Process.

The General Motors Dispute Resolution Process is set forth in a separate booklet, and this Process will be administered by a Joint Mediation/Arbitration Committee composed of dealers and General Motors representatives. General Motors may amend the Process from time to time, but will consult with the Joint Mediation/Arbitration Committee before making any changes.

# ARTICLE 17.  GENERAL PROVISIONS

## 17.1    *No Agent or Legal Representative Status*

This Agreement does not make either party the agent or legal representative of the other for any purpose, nor does it grant either party authority to assume or create any obligation on behalf of or in the name of the others. No fiduciary obligations are created by this Agreement.

## 17.2    *Responsibility for Operations*

Except as provided in this Agreement, Dealer is solely responsible for all expenditures, liabilities and obligations incurred or assumed by Dealer for the establishment and conduct of its operations.

GM000336

### 17.3    Taxes

Dealer is responsible for all local, state, federal, or other applicable taxes and tax returns related to its dealership business and will hold General Motors harmless from any related claims or demands made by any taxing authority.

### 17.4    Indemnification by General Motors

General Motors will assume the defense of Dealer and indemnify Dealer against any judgment for monetary damages or rescission of contract, less any offset recovered by Dealer, in any lawsuit naming Dealer as a defendant relating to any Product that has not been altered when the lawsuit concerns:

17.4.1  Breach of the General Motors warranty related to the Product, bodily injury or property damage claimed to have been caused solely by a defect in the design, manufacture, or assembly of a Product by General Motors (other than a defect which should have been detected by Dealer in a reasonable inspection of the Product);

17.4.2  Failure of the Product to conform to the description set forth in advertisements or product brochures distributed by General Motors because of changes in standard equipment or material component parts unless Dealer received notice of the changes prior to retail delivery of the affected Product by Dealer; or

17.4.3  Any substantial damage to a Product purchased by Dealer from General Motors which has been repaired by General Motors unless Dealer has been notified of the repair prior to retail delivery of the affected Product.

If General Motors reasonably concludes that allegations other than those set forth in 17.4.1, 17.4.2, or 17.4.3 above are being pursued in the lawsuit, General Motors shall have the right to decline to accept the defense or indemnify dealer or, after accepting the defense, to transfer the defense back to Dealer and withdraw its agreement to indemnify Dealer.

Procedures for requesting indemnification, administrative details, and limitations are contained in the Service Policies and Procedures Manual under "Indemnification." The obligations assumed by General Motors are limited to those specifically described in this Article and in the Service Policies and Procedures Manual and are conditioned upon compliance by Dealer with the procedures described in the Manual. This Article shall not affect any right either party may have to seek indemnification or contribution under any other contract or by law and such rights are hereby expressly preserved.

### 17.5    Trademarks and Service Marks

General Motors, its subsidiaries or other affiliated companies are the exclusive owners or licensees of the various trademarks, service marks, names and designs (Marks) used in connection with Products and services.

Dealer is granted the non-exclusive right to display Marks in the form and manner approved by General Motors in the conduct of its dealership business. Dealer agrees to permit any designated representative of General Motors upon the Premises during regular business hours to inspect Products or services in connection with Marks.

GM000337

Dealer will not apply to register or maintain a registration for any Marks either alone or as part of another mark, and will not take any action which may adversely affect the validity of the Marks or the goodwill associated with them. Dealer will not apply to register or maintain a registration for any name which includes a Mark as an Internet domain name without General Motors prior written approval. Upon written notice by General Motors of any such applications or registrations by Dealer, Dealer will, at the election of General Motors, expressly abandon or assign the name to General Motors no later than 30 days from receipt of such notice.

Dealer agrees to purchase and sell goods bearing Marks only from parties authorized or licensed by General Motors.

Marks may be used as part of the Dealer's name with General Motors written approval. Dealer agrees to change or discontinue the use of any Marks upon General Motors request.

Dealer agrees that no company owned by or affiliated with Dealer or any of its investors may use any Mark to identify a business without General Motors written permission.

Upon termination of this Agreement, Dealer agrees to immediately discontinue, at its expense, all use of Marks, including but not limited to removal of all Marks from any and all Dealer owned signs. Thereafter, Dealer will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that General Motors determines is likely to cause confusion or mistake or deceive the public.

Dealer will reimburse General Motors for all legal fees and other expenses incurred in connection with action to require Dealer to comply with this Article 17.5.

### 17.6    Notices

Any notice required to be given by either party to the other in connection with this Agreement will be in writing and delivered personally or by first class or express mail or by facsimile, or electronically as provided in this Agreement. Notices to Dealer will be directed to Dealer or its representatives at Dealer's principal place of business and, except for indemnification requests made pursuant to Article 17.4, notices by Dealer will be directed to the appropriate Regional Director of General Motors.

### 17.7    No Implied Waivers

The delay or failure of either party to require performance by the other party or the waiver by either party of a breach of any provision of this Agreement will not affect the right to subsequently require such performance.

### 17.8    Assignment of Rights or Delegation of Duties

Dealer has not paid any fee for this Agreement. Neither this Agreement nor any right granted by this Agreement is a property right.

Except as provided in Article 12, neither this Agreement nor the rights or obligations of Dealer may be sold, assigned, delegated, encumbered or otherwise transferred by Dealer.

General Motors may assign this Agreement and any rights, or delegate any obligations, under this

27

GM000338

Agreement to any affiliated or successor company, and will provide Dealer written notice of such assignment or delegation. Such assignment or delegation shall not relieve General Motors of liability for the performance of its obligations under this Agreement.

### 17.9 No Third Party Benefit Intended

This Agreement is not enforceable by any third parties and is not intended to convey any rights or benefits to anyone who is not a party to this Agreement.

### 17.10 Accounts Payable

All monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries. In addition, General Motors may deduct any amounts due or to become due from Dealer to General Motors or its subsidiaries, or any amounts held by General Motors, from any sums or accounts due or to become due from General Motors, or its subsidiaries.

### 17.11 Sole Agreement of Parties

Except as provided in this Agreement or in any other unexpired written agreements executed by both parties, General Motors has made no promises to Dealer, Dealer Operator, or dealer investor and there are no other agreements or understandings, either oral or written, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement.

Except as otherwise provided herein, this Agreement cancels and supersedes all previous agreements between the parties that relate to any matters covered herein, except as to any monies which may be owing between the parties and any other unexpired written agreements executed by both parties.

No agreement between General Motors and Dealer which relates to matters covered herein, including the grant or amendment of any Dealer Agreement and no change in, addition to (except the filling in of blank lines) or modification of this Agreement, will be binding unless approved in a written agreement executed by an authorized person. Approvals required or provided for under this Agreement must be in writing by an authorized person. No General Motors representative is authorized to orally grant, waive or revise any terms of this Agreement or any rights conferred under this Agreement. General Motors and Dealer expressly waive application of any local, state or federal law, statute, or judicial decision allowing oral grant, modifications, amendments, or additions of a Dealer Agreement notwithstanding an express provision requiring a writing signed by the Parties.

### 17.12 Applicable Law

This agreement is governed by the laws of the State of Michigan. The provisions of this Agreement will be deemed severable, and if any provision of this Agreement is held illegal, void, or invalid under applicable law effective in the resident jurisdiction of Dealer as of the effective date of this agreement, such provision shall be interpreted as amended to the extent reasonably necessary to make the provision legal, valid, and binding. If any provision of this Agreement is held illegal, void, or invalid in its entirety, the remaining provisions of this Agreement will not be affected but will remain binding in accordance with their terms.

28

GM000339

Case 1:18-cv-02658-VSB    Document 6    Filed 03/26/18    Page 63 of 122    Exhibit B

### 17.13    Superseding Dealer Agreements

If General Motors offers a superseding form of dealer agreement or an amendment to the dealer agreement to General Motors dealers generally at any time prior to expiration of this Agreement, General Motors may terminate this Agreement by ninety days prior written notice to Dealer, provided General Motors offers Dealer a dealer agreement in the superseding form for a term of not less than the unexpired term of this Agreement.

Unless otherwise agreed in writing, the rights and obligations of Dealer that may otherwise become applicable upon termination or expiration of the term of this Agreement shall not be applicable if General Motors and Dealer execute a superseding dealer agreement, and the matured rights and obligations of the parties hereunder shall continue under the new agreement.

Dealer's performance under any prior agreement may be considered in an evaluation of Dealer's performance under this or any succeeding agreement.

GM000340

Case 1:18-cv-03658-VSB    Document 6    Filed 06/28/18    Page 64 of 122

# GLOSSARY

**Area of Primary Responsibility** — The geographic area designated by General Motors from time to time in a Notice of Area of Primary Responsibility.

**Dealer** — The legal business entity, (e.g.corporation, partnership, limited liability company, or limited liability partnership) that enters into the Dealer Agreement with General Motors.

**Dealer Agreement** — The Dealer Sales and Service Agreement, including the Agreement proper that is executed, the Standard Provisions, and all of the related Addenda.

**Dealership Operations** — All operations contemplated by the Dealer Agreement. These operations include the sale and service of Products and any other activities undertaken by Dealer related to Products, including rental and leasing operations, used vehicle sales and body shop operations, finance and insurance operations, any electronic commerce, and any service of other General Motors motor vehicles authorized by General Motors, whether conducted directly or indirectly by Dealer.

**General Motors** — General Motors LLC

**Dealer Sales Allowance And Incentive Manual** — The Manual issued periodically which details certain policies and procedures related to dealer or customer incentives or promotions.

**Line-Make** — A brand of General Motors Motor Vehicles, or a brand used to badge motor vehicles for another manufacturer. For this Dealer Agreement, the General Motors brands are Chevrolet, Buick, GMC and Cadillac.

**Products** — Motor Vehicles, Parts and Accessories.

**Motor Vehicles** — All current model types or series of new motor vehicles specified in any Motor Vehicle Addendum incorporated into this Agreement and all past General Motors motor vehicles marketed through Motor Vehicle Dealers.

**Service Policies and Procedures Manual** — The Manual issued periodically which details certain administrative and performance requirements for Dealer service under the Dealer Agreement.

**Special Vehicles** — Motor Vehicles that have limited marketability because they differ from standard specifications or incorporate special equipment.

GM000341

# Dispute Resolution Process

## 2015

### GENERAL MOTORS LLC

GM000342

# THE GENERAL MOTORS LLC
# DISPUTE RESOLUTION PROCESS

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **Preamble** | **1** |
| **Joint Mediation/Arbitration Committee** | **1** |
| **Mandatory Mediation** | **1** |
| A.  Matters to be Mediated | 2 |
| B.  Mediation and Time Schedule | 2 |
| C.  Mediation Panel | 3 |
| D.  Mediation Panel Selection | 3 |
| E.  Exchange of Information Before the Mediation | 4 |
| F.  Use of Legal Counsel and Experts | 4 |
| **Voluntary Binding Arbitration** | **4** |
| A. Request for Arbitration | 5 |
| B. Arbitration Panel Selection | 5 |
| C. Discovery | 5 |
| D. Arbitration Summary | 6 |
| E. Use of Legal Counsel and Experts | 6 |
| F. Arbitration Hearing | 6 |
| G. Post Hearing Briefs | 7 |
| H. Decision | 7 |
| **General** | **7** |
| A. Confidentiality | 7 |
| B. Disqualification of The JMAC, Mediators/ Arbitrators, and the Administrator | 8 |
| C. Exclusion of Liability | 8 |
| D. Expenses | 8 |

GM000343

Case 1:18-cv-03658-VSB    Document 6    Filed 06/28/18    Page 67 of 122

# THE GENERAL MOTORS LLC
# DISPUTE RESOLUTION PROCESS

## PREAMBLE

General Motors LLC ("GM") and its General Motors Dealers ("Dealers") have agreed to use this Dispute Resolution Process ("the Process") for the resolution of disputes and controversies that may arise between them under the Dealer Sales and Service Agreement ("Dealer Agreement") or applicable laws. The objective of the Process is the fair resolution of disputes in a prompt and cost effective manner. The Process provides for mediation that is mandatory and non-binding, unless a solution is agreed upon by all parties. If the matter is not resolved then an option for voluntary binding arbitration is available.

## JOINT MEDIATION/ARBITRATION COMMITTEE

The Joint Mediation/Arbitration Committee ("JMAC") will manage and oversee the Process, determine rules for dispute eligibility and resolve any disputes regarding the interpretation and applicability of these procedures. The JMAC also will select a national dispute resolution process firm ("Administrator") to administer the Process and to maintain a trained pool of Mediators and Arbitrators (Mediator/Arbitrator Pool). The JMAC will be comprised of five dealers (three dealers will be active members of the JMAC and two dealers will be alternate members of the JMAC) and three GM Representatives. The dealer JMAC members will be selected by the appropriate GM Dealer Councils, including the Dealer Executive Board and will serve for a term determined by the JMAC. The JMAC may amend the Process procedures, and will report annually to the Dealer Executive Board.

## MANDATORY MEDIATION

Mediation is an informal process where each party is provided an opportunity to present its side of the dispute. Through joint meetings and confidential discussions with each side, the Mediation Panel will test positions and clarify objectives, as well as encourage new perspectives and mutually beneficial resolution options. No record shall be made of the mediation proceedings. All parties must come to the mediation with sufficient resources and authority to reach a final settlement.

Dealer and GM agree to submit all eligible disputes as defined by Subsection A ("Matters to be Mediated") to mediation using the procedures set forth below prior to filing a complaint or protest in court or with an administrative agency based on its rights under the Dealer Agreement or applicable laws. A dealer or GM may file simultaneously with a court or an administrative agency if necessary to retain its rights under applicable law. In this event, Dealer and GM agree to ask the court or agency to stay proceedings until the mediation under this Process is concluded.

GM000344

## A. MATTERS TO BE MEDIATED

The Process is available to GM and Dealers with a current GM Dealer Agreement (not terminated dealers, prospective dealers or any third party) to mediate disputes arising under the Dealer Agreement or applicable laws. The following matters are ineligible under the Process: i) terminations due to insolvency; ii) dealership closings due to failure to conduct customary sales and service operation during customary business hours for seven consecutive business days; iii) license revocation; iv) fraud or felony convictions; v) disputes requiring participation by a third party who does not agree to participate in mediation and; vi) disputes challenging GM Policies or Procedures as applied to dealers generally.  Except for the ineligible matters described above, a dealer's standing to bring disputes or protests to the Process for disputes addressed by state law shall be the same as those conferred by state law in the jurisdiction of the proposed action.

GM and Dealers agree that delivery of a completed "Request for Mediation" form to the Administrator and notice by the Administrator to the other party will automatically defer any action by GM or Dealer on the eligible matter in dispute until the Process is completed, unless the dispute is not eligible for a stay under applicable motor vehicle state franchise law and GM determines that the automatic stay may adversely affect a third party's rights.  If more than one Dealer requests mediation on an identical dispute with GM, the requests may be consolidated into a single mediation proceeding.

## B. MEDIATION AND TIME SCHEDULE

The time from the filing of a dispute to completion of the mediation will depend on the complexity of the case, necessary background information to be exchanged, and the number of parties.  The Administrator will work to expedite the Process through the following three-step procedure:

Step 1. Filing - A Dealer or GM may initiate the Process by the delivery of a completed "Request for Mediation" form (attached), and a deposit as specified in the filing form to the Administrator.  This form must be filed within thirty days of receipt of a disputed eligible final decision of either party.  The form must also be submitted prior to the Dealer or GM initiating a complaint or protest in court or with an administrative agency over an eligible dispute, except if necessary to protect its rights as specified above.  The Administrator will forward a copy of the form to the other named party(ies).

Step 2. Issue Review - Within five working days of the receipt of the filing form from the Administrator, the other named party(ies) to the mediation shall inform the Administrator of any objection based upon its opinion that the dispute is outside the scope of the Process.  If there is no objection, the Administrator shall commence arrangements for the mediation at the close of the five-day period.  If the Administrator receives an objection, the Administrator will refer the issue to the JMAC.  The JMAC shall determine if the dispute is within the scope of the Process and whether standing exists.  The Administrator shall notify the parties of the JMAC's decision, which shall be final (and return the filing fee if the dispute is not eligible).

2

GM000345

Step 3.  Arranging the Mediation - Within ten working days of the expiration period for objections or of the JMAC's determination that the request for mediation is eligible, the Administrator will provide a list of the potential trained mediators as outlined under Subsection D ("Mediation Panel Selection").  The Administrator also will arrange a preliminary telephone conference with representatives from each party.  The purpose of the preliminary telephone conference is to:

- answer any questions about the Process.
- decide on the participation of legal counsel, outside experts, or other persons attending the Mediation.
- discuss the preparation of a short pre-mediation written statement or summary.
- confirm the mediation date, and complete arrangements for a mediation in one of the cities listed below:

Atlanta, GA, Boston, MA, Chicago, IL, Dallas, TX, Denver, CO, Detroit, MI,
Fort Lauderdale, FL, Los Angeles, CA, Newark, NJ, Orlando, FL, Seattle, WA
(This list may be amended from time to time at GM's discretion.)

The Administrator, and if necessary the JMAC, will resolve any disputes regarding pre-mediation arrangements.  Every effort will be made to conduct the mediation within 30 days of the preliminary telephone conference call and to complete the mediation within one day or less.

## C.  MEDIATION PANEL

The Mediation Panel will consist of one Independent Mediator (Independent Mediator should be a licensed attorney or retired judge), one Dealer Operator, and one GM Representative selected from the Mediator Pool.
The role of the Mediation Panel is as follows:

- The Mediation Panel will work with the parties to reach a negotiated settlement but will have no decision-making authority.
- Where an agreement is reached, a written memorandum of the agreement will be prepared and executed by each party.
- Within three days after the Mediation Panel adjourns, the Independent Mediator will advise the Administrator whether the matter is resolved.

## D.  MEDIATION PANEL SELECTION

The Administrator will select five Dealer Operators, five GM Representatives, and an Independent Mediator from the trained Mediator Pool.  The Administrator will send the lists of Dealer Operators and GM Representatives simultaneously to the Dealer and GM.  The Dealer and GM may eliminate one name from each list, and will rank the remaining members of each list in order of preference. The Dealer and GM will return those lists to the Administrator within five days of receipt.

3

GM000346

The Administrator will select one Dealer Operator and one GM Representative to serve with the Independent Mediator as the Mediation Panel, by identifying candidates with the highest combined ranking. If a tie occurs, the Administrator will select the Mediator at its discretion.

The Administrator will notify the Mediators when they have been selected and, at that time, each Mediator must disclose to the Administrator any circumstances that might preclude the Mediator from being objective and impartial. Should such a circumstance exist, the Administrator will notify the parties, who will discuss whether the Mediator should be disqualified. If the Dealer Operator or GM Representative is disqualified, the Mediator with the next highest ranking will be selected, or the entire process will be repeated, if necessary. If the Independent Mediator is disqualified, the Administrator will select a new Independent Mediator.

## E.  EXCHANGE OF INFORMATION BEFORE THE MEDIATION

At a mutually agreed time prior to the scheduled mediation, each party must submit to the Administrator documents it believes will be helpful in establishing its position in sufficient quantities for the parties and the Mediation Panel, and a list of all persons who will attend the mediation. At least five days before the mediation, the Administrator will provide a copy of all documents and an attendance list to the other party(ies). A party may informally suggest that the other party make available certain information or documents for the mediation that may be helpful in resolving the dispute, but no formal discovery is permitted in a mediation proceeding. To avoid surprise and to increase efficiency, documents or resources not previously disclosed will not be considered at the mediation, unless all parties agree or the Mediation Panel determines that the new information is essential for resolving the dispute.

## F.  USE OF LEGAL COUNSEL AND EXPERTS

The mediation is designed to be an informal business discussion. The parties do not need a legal counsel or outside experts and are encouraged not to incur such expense. However, a party may choose to have legal counsel or outside experts participate in the mediation. Their participation in the mediation session must be disclosed in the preliminary telephone conference. If the Dealer advises that it will not be represented by legal counsel or an expert, GM will not be represented by legal counsel or an expert.


# VOLUNTARY BINDING ARBITRATION


Arbitration offers General Motors and the General Motors dealers an additional opportunity to resolve disputes not concluded in the Mediation Process. Arbitration is voluntary and both parties must agree to use the process. Both parties present their positions to an Arbitration Panel and the Arbitration Panel renders a decision. Decisions rendered by the Arbitration Panel will be binding on both parties.

GM000347

## A. REQUEST FOR ARBITRATION

If a matter eligible for mediation under the Process is not resolved through mediation, the Dealer or GM may request arbitration by filing a completed "Request for Binding Arbitration" form and a deposit as specified on the "Request for Binding Arbitration" form with the Administrator. The request must include a brief description of the dispute and all relief requested, including the specific amount of any monetary relief requested, and such other information as required by the form. A "Request for Binding Arbitration" must be filed within ten business days after the conclusion of the Mediation Process. The Administrator will forward the request to the other parties. The other party must decide within ten business days of receipt of the "Request for Binding Arbitration" whether to accept the offer to resolve the dispute through arbitration. Return of a signed copy of the "Request for Binding Arbitration" form to the Administrator signifies acceptance of the offer to arbitrate. If the Dealer and GM agree to binding arbitration under this process, any administrative or judicial proceedings filed by either party related to the dispute to be arbitrated must be dismissed with prejudice within 10 days of the agreement to arbitrate.

## B. ARBITRATION PANEL SELECTION

The Administrator will select five Dealer Operators, five GM Representatives, and three Independent Arbitrators (Independent Arbitrators must be a licensed attorney) from the trained Arbitrator Pool, and will send the lists simultaneously to the Dealer and GM within 10 days of the receipt of the executed "Request for Binding Arbitration". The Dealer and GM may eliminate one name from the Dealer Operator list and one name from the GM Representative lists, and will rank the remaining members of each list in order of preference. The Dealer and GM will rank the three Independent Arbitrator candidates in order of preference. The Dealer and GM will return those lists to the Administrator within five days of receipt.

The Administrator will select one Dealer Operator, one GM Representative, and one Independent Arbitrator for the Arbitration Panel by identifying candidates with the highest combined ranking. If a tie occurs, the Administrator will select the Arbitrator at its discretion.

The Administrator will notify the Arbitrators when they have been selected and, at that time, each Arbitrator must disclose to the Administrator any circumstances that might preclude the Arbitrator from being objective and impartial. Should such a circumstance exist, the Administrator will notify the parties, who will discuss whether the Arbitrator should be disqualified. If the Dealer Operator, GM Representative, or Independent Arbitrator is disqualified, the Arbitrator with the next highest ranking will be selected, or the entire process will be repeated, if necessary.

## C. DISCOVERY

Discovery is permitted in any arbitration proceeding, but is limited to the production of documents specifically relevant to and considered by either party in assessing the disputed action and which are in the possession and control of the party from whom discovery is sought. Such document production should be consistent with the spirit of simple, efficient, and low cost dispute resolution intended by this Process, while at the same time ensuring a full and fair hearing. A document production request with specificity must be filed with the Administrator within fifteen days after

GM000348

the Process; any documents created for the Process; and any mediation or arbitration agreements between the parties are confidential and privileged and will neither be discoverable, admissible, nor used for any purpose, including impeachment, in any pending or subsequent litigation, arbitration, mediation or administrative proceeding. Evidence that is otherwise discoverable or admissible will not be rendered non-discoverable or inadmissible as a result of its use in the Process. Any transcripts or recordings of a hearing under the Process are intended solely for use in connection with the Process and will be destroyed within thirty days from the date of the Panel's decision. NO DECISION ISSUED OR AGREEMENT REACHED UNDER THE PROCESS WILL SERVE AS PRECEDENT IN ANY SUBSEQUENT MEDIATIONS, ARBITRATIONS, OR JUDICIAL PROCEEDINGS.

## B.  DISQUALIFICATION OF THE JMAC, MEDIATORS/ARBITRATORS, AND THE ADMINISTRATOR

The parties to the Process will not call members of the JMAC, the Mediators/Arbitrators, or the Administrator or its employees or agents, as witnesses or experts, and each such individual will be disqualified as a witness or expert in any pending or subsequent litigation, arbitration or administrative proceeding relating to the dispute which is the subject of the Process.

## C.  EXCLUSION OF LIABILITY

Neither the members of the JMAC, the Administrator nor its employees or agents, GM nor its employees or agents, nor any of the Mediators/Arbitrators or their dealerships and employees, will be liable to any party for any act or omission in connection with any matter coming under this Process; nor will any such individual or entity be a necessary party in any judicial or administrative proceeding or arbitration relating to the matter coming under this Process.

## D.  EXPENSES

The Dealer and GM will share equally in all administrative expenses, including but not limited to travel, lodging and meals of the Administrator and the Panels, fees of the Independent Mediators/Arbitrators, rental of meeting or hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the Mediation and/or Arbitration Process. If Dealer does not pay the Administrator within thirty days of receiving an invoice, GM may reimburse the Administrator and offset this amount owing against any amounts GM owes Dealer. Each party is responsible for its own out of pocket expenses.

GM000351

from any representative of either party. Formal rules of evidence will not apply. The Arbitration Panel, in its sole discretion, may have all or any portion of the proceedings transcribed or recorded. The Independent Arbitrator will ensure that the hearing is focused on the issues and is conducted in an orderly, efficient, and fair manner in accordance with the Process.

Attendance at the hearings will be limited to the parties, their representatives or witnesses, the Arbitration Panel, the Administrator, and any other persons the Arbitration Panel members determine are necessary to properly administer the hearing.

## G. POST HEARING BRIEFS

There will be no post hearing briefs except in those cases where the Arbitration Panel determines that briefs are necessary for it to reach a conclusion. If briefs are requested, the Arbitration Panel will determine a permissible length. The briefs must be filed no later than fourteen days following the close of the hearing.

## H. DECISION

The Arbitration Panel will issue its decision within seven days of the close of the hearing, or submission of post hearing briefs, whichever is later. In reaching its decision, the Arbitration Panel will consider general concepts of law and equity so that the decision will achieve a fair and just result, without modifying the terms of the Dealer Agreements between the parties. The Arbitration Panel may award monetary relief (not to exceed the specific amount requested in the "Request for Binding Arbitration"), or provide for such equitable relief concerning the matter in dispute that the Arbitration Panel considers fair and just to resolve the dispute. THE DECISION OF THE ARBITRATION PANEL WILL BE BINDING UPON BOTH DEALER AND GM IN ACCORDANCE WITH THE UNITED STATES ARBITRATION ACT, TITLE 9, UNITED STATES CODE, SECTIONS 1-14.

The Independent Arbitrator will provide advice and counsel to the other two Arbitration Panel members during the decision-making process, but will not participate in the decision-making process unless the Dealer Arbitrator and the GM Arbitrator on the Arbitration Panel are unable to agree upon a decision. In which case, the Independent Arbitrator will become the third decision-maker, and will cast the deciding vote.

# GENERAL

The General items listed in this section apply to both mediation and arbitration as outlined.

## A. CONFIDENTIALITY

This Process is intended to resolve disputed claims. All offers, promises, conduct and statements, whether oral or written, by any of the parties, including the JMAC, the Administrator, and the Panel, and their agents, employees, experts, and legal counsel, at any time before, during or after

GM000350

the commencement of the arbitration process. Within thirty days of receipt of such a request, the party to whom the request is directed must respond by:

- producing the requested documents with copies for each party and each Arbitrator.
- advising of a reasonable time and place at which the requested documents will be made available for inspection and copying.
- raising detailed objections with the Administrator, including any claims of privilege, to specific requests, and the Independent Arbitrator, with the assistance of the Arbitration Panel as necessary, will resolve such discovery disputes.

Within five days of receiving any objections, the Administrator will refer the matter to the Independent Arbitrator who will schedule a conference call with the parties to discuss the objections. Within five days of the call, the Independent Arbitrator, with the assistance of the Arbitration Panel as necessary, will rule on objections to produce.

## D.  ARBITRATION SUMMARY

The Dealer and GM will each prepare an Arbitration Summary of not more than ten pages. The Arbitration Summary will describe the basis for the dispute, identify the issues, explain the relief sought, identify the parties' representatives at the hearing, indicate those matters which the representatives will address and identify the documents to be presented by each representative. Each party must provide its summary and its witness list to the Administrator for distribution to the Arbitration Panel and to the other party(ies) no later than 20 days prior to the scheduled arbitration hearing. The Arbitration Panel will consider only those documents or statements prepared and submitted in accordance with this paragraph.

## E.  USE OF LEGAL COUNSEL AND EXPERTS

The Dealer will advise the Administrator at least 30 days prior to the scheduled arbitration hearing whether the Dealer will be represented by legal counsel or any expert witness at the hearing, and the Administrator will advise GM. If the Dealer advises that it will not be represented by legal counsel or an expert witness, GM will not be represented by legal counsel or an expert witness.

## F.  ARBITRATION HEARING

The Administrator will establish a hearing date that is within ninety days of the filing of the "Request for Binding Arbitration" form. The hearing will be within the involved region, unless the parties agree otherwise. The Administrator will notify the parties of the time and place of the hearing.

Each party will present its case through its selected representatives and witnesses. Witnesses will be subject to cross-examination related to the issues involved in the arbitration by the parties and the Arbitration Panel. The Dealer Operator need not be a representative, but must be present at the hearing. Each party will have the opportunity to respond to points made by the other party until the Arbitration Panel is satisfied that each party has had a full opportunity to present its position. The Arbitration Panel may, at any time during the hearing, ask for additional information

6

GM000349

# EXHIBIT D

CTQ-2015-00002

# Court of Appeals

*of the*

# State of New York

BECK CHEVROLET CO., INC.,

*Appellant,*

– v. –

GENERAL MOTORS LLC,

*Respondent.*

ON APPEAL FROM THE QUESTIONS CERTIFIED BY THE
UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
IN DOCKET NOS. 13-4066-CV AND 13-4310-CV

## BRIEF FOR *AMICI CURIAE* ALLIANCE OF AUTOMOBILE MANUFACTURERS AND ASSOCIATION OF GLOBAL AUTOMAKERS IN SUPPORT OF DEFENDANT-RESPONDENT

JOHN J. SULLIVAN
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Tel.: (212) 918-3000
Fax: (212) 918-3100

*Attorneys for Amici Curiae Alliance of
Automobile Manufacturers and
Association of Global Automakers*

Date Completed: February 4, 2016

## <u>DISCLOSURE STATEMENT</u>

The Alliance of Automobile Manufacturers and the Association of Global Automakers are not-for-profit corporations, which have no parent companies, no subsidiaries, and no affiliates.

# Table of Contents

**Page**

DISCLOSURE STATEMENT ..................................................................... i

TABLE OF AUTHORITIES ...................................................................... iii

CERTIFIED QUESTIONS ......................................................................... vi

STATEMENT OF INTEREST ................................................................... 1

INTRODUCTION ....................................................................................... 3

STATEMENT OF FACTS .......................................................................... 8

ARGUMENT ............................................................................................... 15

   I.    GM DID NOT USE AN UNREASONABLE, ARBITRARY
       OR UNFAIR PERFORMANCE STANDARD .......................................... 15

   II.   THE APR REVISION WAS NOT A PROHIBITED
       MODIFICATION OF THE FRANCHISE ................................................ 22

       A.   Exercising a Contract Right Is Not a "Modification" ......................... 22

       B.   Many Changes to a Dealer's APR Will Not
          "Substantially and Adversely Affect" the Dealer ............................... 31

     CONCLUSION .................................................................................... 34

\\NY - 029012/000004 - 4646460 v3

## Table of Authorities

**Page**

**CASES:**

*BMW of North America, Inc. v. New Motor Vehicle Board*,
    162 Cal. App. 3d 980, 209 Cal. Rptr. 50 (1984) ....................................11, 12, 30

*Bray v. Tejas Toyota, Inc.*,
    363 S.W.3d 777 (Tex. App. 2012).............................................................24, 31

*Crown Auto Dealerships, Inc. v. Jaguar Cars*,
    DOAH Case No. 96-4657 (Fla. DHSMV March 17, 1997)...............................32

*Fred Lavery Co. v. Nissan North America, Inc.*,
    99 F. App'x 585 (6th Cir. 2004) .........................................................10, 14, 18

*General Motors Corp. v. Stan Olsen Pontiac GMC-Trucks, Inc.*,
    No. CI 03-2208 (Neb. Dist. Ct. Dec. 9, 2003)......................................................17

*Hartley Buick GMC Truck, Inc. v. American Honda Motor Co., Inc.*,
    No. FMD 2010-05 (N.Y. DMV Div. of Safety & Bus. Hearings
    Nov. 1, 2011) ...........................................................................................10, 11, 16

*In re Associated Teachers of Huntington, Inc. v. Board of Educ.*,
    33 N.Y.2d 229, 351 N.Y.S.2d 670 (1973).........................................................24

*In re Ralph Gentile, Inc. v. Nissan North America, Inc.*,
    No. TR-07-0001 (Wis. Div. of Hearings and Appeals, Feb. 4,
    2010) ....................................................................................................13, 14, 19

*In re Seacoast Imported Auto, Inc.*,
    No. 04-06 (N.H. Motor Veh. Ind. Bd. Apr. 12, 2010)...........................14, 15, 17

*Infiniti Auto. of Norwood, Inc. v. Nissan North America, Inc.*,
    No. 2004-00010 (Mass. Super. Ct. Aug. 4, 2005).............................................11

*JJM Sunrise Automotive, LLC v. Volkswagen Group of America, Inc.*,
    46 Misc. 3d 755 (Sup. Ct. Nassau Co. 2014) ...............................................28, 29

*Lanham Ford, Inc. v. Ford Motor Co.*,
    No. MDOT-MVA-12-03-10560 (Md. MVA Aug. 10, 2005) ...........................17

<u>**Table of Authorities**</u>**—Continued**

**Page**

*Love Nissan, Inc. v. Nissan North America, Inc.*,
    DOAH Case No. 04-2247 (Fla. DHSMV Apr. 13, 2006) ...............14, 15, 17, 19

*Luxury Autos of Huntington, Inc. v. Volkswagen Group of America, Inc.*,
    No. 602591-14, 49 Misc. 3d 1207(A), 2015 WL 5946047 (Table)
    (Sup. Ct. Nassau Co. Sept. 21, 2015) .........................................................28, 29

*Nissan North America, Inc. v. Royal Nissan Inc.*,
    794 So. 2d 45 (La. Ct. App. 2001).......................................................................27

*Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.*,
    966 F. Supp. 167 (E.D.N.Y. 1997) ......................................................................24

*Racine Harley-Davidson, Inc. v. State Div. of Hearings & Appeals*,
    292 Wis. 2d 549, 717 N.W.2d 184 (2006) ....................................................27, 28

*Ralph Gentile, Inc. v. State Div. of Hearings and Appeals*,
    334 Wis. 2d 712, 800 N.W.2d 555 (Wis. Ct. App. 2011) ............................13, 14

*Rambasek v. Nissan North America, Inc.*,
    No. 09-03-MVDB-286-D (Ohio MVDB Jan. 7, 2005) ................................11, 17

*Sims Buick-GMC Truck, Inc. v. Nissan North America, Inc.*,
    No. 9-12-MVDB-364-D (Ohio MVDB Feb. 4, 2011) .......................................17

*Subaru Distributors Corp. v. Subaru of America, Inc.*,
    47 F. Supp. 2d 451 (S.D.N.Y. 1999) ...................................................................24

*Superior Pontiac Buick GMC, Inc. v. Nissan North America, Inc.*,
    No. 08-10642, 2012 WL 1079719 (E.D. Mich. Mar. 30, 2012).........9, 10, 12, 19

*Van Wie Chevrolet, Inc. v. General Motors, LLC*,
    No. 2012-0284 (Sup. Ct. Onondaga Co. June 13, 2014).......................28, 29, 30

**STATUTES:**

N.Y. Veh. & Traf. L. §§ 460 *et seq.* .........................................................................3

N.Y. Veh. & Traf. L. § 462(6) .................................................................................23

<u>**Table of Authorities—Continued**</u>

**Page**

N.Y. Veh. & Traf. L. § 462(15) ..................................................................26

N.Y. Veh. & Traf. L. § 463(d) ...................................................................26

N.Y. Veh. & Traf. L. § 463(k) ...................................................................26

N.Y. Veh. & Traf. L. § 463(2)(d) ...............................................................25

N.Y. Veh. & Traf. L. § 463(2)(e)(1) ..........................................................25

N.Y. Veh. & Traf. L. § 463(2)(y) .................................................................8

N.Y. Veh. & Traf. L. § 463(2)(cc) ................................................26, 28, 29

N.Y. Veh. & Traf. L. § 463(2)(cc)(1) .........................................................26

N.Y. Veh. & Traf. L. § 463(2)(cc)(2) .........................................................29

N.Y. Veh. & Traf. L. § 463(2)(cc)(3) .........................................................26

N.Y. Veh. & Traf. L. § 463(2)(ff) ........................................................*passim*

N.Y. Veh. & Traf. L. § 463(2)(ff)(1) ...........................................................3

N.Y. Veh. & Traf. L. § 463(2)(ff)(2) ..............................................3, 23, 31

N.Y. Veh. & Traf. L. § 463(2)(gg) ...............................................5, 6, 15, 27

N.Y. Veh. & Traf. L. § 465(7) ...................................................................26

N.Y. Veh. & Traf. L. § 470 .......................................................................24

Fla. Stat. § 320.641(3) ..............................................................................21

Ga. Code § 10-1-663(b)(3) ........................................................................21

Mo. Rev. Stat. § 407.825(27) ....................................................................21

N.Y.U.C.C. § 2-311(1) ..............................................................................24

## CERTIFIED QUESTIONS

1.     Is a performance standard that requires "average" performance based on statewide sales data in order for an automobile dealer to retain its dealership "unreasonable, arbitrary, or unfair" under New York Vehicle & Traffic Law section 463(2)(gg) because it does not account for local variations beyond adjusting for the local popularity of general vehicle types?[1]

2.     Does a change to a franchisee's Area of Primary Responsibility or AGSSA constitute a prohibited "modification" to the franchise under section 463(2)(ff), even though the standard terms of the Dealer Agreement reserve the franchisor's right to alter the Area of Primary Responsibility or AGSSA in its sole discretion?

---

[1] Respondent General Motors has requested that this question be reframed to more accurately reflect (a) the statutory provision in question and (b) the issue that was actually tried by the U.S. District Court.   Resp. Br. at 35-38.   The Alliance of Automobile Manufacturers and the Association of Global Automakers support that request.

## STATEMENT OF INTEREST

The Alliance of Automobile Manufacturers, Inc. (the "Alliance") and the Association of Global Automobiles ("Global Automakers" and, collectively, with the Alliance, "Amici") respectfully submit this brief as *amici curiae* in support of the position of respondent General Motors, LLC ("GM"), that the questions certified by the U.S. Court of Appeals for the Second Circuit should be answered in the negative.

The Alliance is a nonprofit trade association comprised of twelve members who are manufacturers and/or distributors[2] of passenger cars and light trucks, viz.: BMW Group; Fiat Chrysler LLC; Ford Motor Company; GM; Jaguar Land Rover; Mazda; Mercedes-Benz USA; Mitsubishi Motors; Porsche Cars North America; Toyota; Volkswagen Group of America; and Volvo Cars of North America, LLC. Global Automakers is a nonprofit trade association whose members include the U.S. manufacturing and distribution subsidiaries of 12 international motor vehicle manufacturers, including American Honda Motor Co.; Aston Martin Lagonda of North America, Inc.; Ferrari North America, Inc.; Hyundai Motor America; Isuzu Motors America, Inc.; Kia Motors America, Inc.; Maserati North America, Inc.; McLaren Automotive Ltd.; Nissan North America, Inc.; Subaru of America, Inc.; Suzuki Motor of America, Inc.; and Toyota Motor North America, Inc. Together,

---

[2] For the sake of brevity, this brief refers to manufacturers and distributors collectively as "manufacturers."

Amici represent almost every automobile manufacturer whose vehicles are sold in the United States.

Amici's members sell their products to independently owned and operated dealerships throughout the United States.   Accordingly, they have a significant interest in the courts' interpretation of the duties owed by manufacturers to those independent businesses.

Amici's mission is to advance the common interests of their members engaged in manufacturing, importing, and/or selling motor vehicles in the United States.   In addition, Amici articulate and advocate their members' needs and interests before the public as well as the legislative, administrative, and judicial branches of local, state, and national governments.   Amici have participated as *amici curiae* in both state and federal courts, including the United States Supreme Court.

Amici have a particularly strong interest in the issues raised in this case because the questions certified to this Court by the Second Circuit are framed in a broad way, such that a broad answer could affect all of their members' business practices.   Further, Beck at times appears to be asking this Court to issue a ruling that would apply to the franchise agreements and decision-making processes of all manufacturers.   *See, e.g.*, Beck Reply Br. at 17.

Amici believe that (i) the decision of the U.S. District Court for the Southern District of New York in favor of GM and against Beck was correct and should be affirmed, and (ii) the questions certified to this Court should not only be answered in the negative, but the answers should be carefully tailored to the facts of, and the actual issues litigated in, this case.

Amici have filed a motion for leave to file this brief.

## INTRODUCTION

The two questions certified to this Court relate to Beck's appeal of two rulings by U.S. District Judge Alvin Hellerstein.

*First*, Judge Hellerstein granted summary judgment dismissing Beck's claim that GM violated the New York Franchised Motor Vehicle Dealer Act (the "Dealer Act"), N.Y. Veh. & Traf. L. ("VTL") §§ 460 *et seq.*, when it revised Beck's "Area of Primary Responsibility" ("APR"). A1635-1638. Section 463(2)(ff)(1) of the Dealer Act makes it unlawful for a franchisor "[t]o modify the franchise" of any dealer without providing the dealer with 90 days' notice and 120 days to file a lawsuit or administrative proceeding protesting the modification. The Act defines "modification" as "any change or replacement of any franchise" that may "substantially and adversely affect" the dealer's rights. VTL § 463(2)(ff)(2).

Judge Hellerstein ruled that there was no "change or replacement" of the franchise because the franchise agreement itself gave GM discretion to revise the

APR. A1635. Accordingly, Judge Hellerstein never reached the question whether there was a change that "substantially and adversely affect[ed]" Beck's rights.

Judge Hellerstein's decision was consistent with the statutory language and with the common-sense meaning of a contract "modification." In this connection, it is important to understand that APRs are not exclusive sales territories granted to dealers; they are merely areas used for assessing dealer *and brand* performance. Thus, the GM franchise agreement defines the APR as an area "used by [GM] in assessing performance of dealers and the dealer network." A143 (Art. 4.2). Because APRs must be revised from time-to-time for a wide variety of reasons, GM expressly "retains the right to revise Dealer's Area of Primary Responsibility at [GM's] sole discretion consistent with dealer network planning objectives." *Id.*

When a party exercises a discretionary right under a contract, the party does not "modify" that contract. An automobile franchise agreement necessarily confers discretion on one or the other of the parties with respect to numerous matters and transactions that will take place during their long-term relationship. To hold, as Beck urges, that a manufacturer's exercise of a discretionary right under a franchise agreement is a "modification" of the franchise, potentially subject to 90 days' notice and a subsequent protest that could take years to reach a final decision, could impose unreasonable and unworkable restrictions on manufacturers with respect to a host of matters, including vehicle pricing and

model introduction and discontinuation.   There is no basis for such an interpretation in the statutory language or the evident legislative intent.

*Second*, Judge Hellerstein found, following a four-day bench trial at which he heard testimony from expert witnesses for both Beck and GM, that Beck had failed to prove that, in using its Retail Sales Index ("RSI") metric, GM had violated the Dealer Act by "us[ing] an unreasonable, arbitrary or unfair sales or other performance standard in determining a [dealer's] compliance with a franchise agreement." VTL § 463(2)(gg). A1673-74; *see* A1197-1228 (findings of fact and conclusions of law). Accordingly, Judge Hellerstein denied Beck's requests for an injunction and a declaratory judgment. A1674.

In support of his ruling, Judge Hellerstein found (among other things) that GM (1) rates as "unsatisfactory" only dealers whose RSI score is below 85 and which rank "in the bottom 15% of dealers in the state," A1211; (2) uses the RSI scores "as a[n] exhortatory tool to get these dealers to improve sales," *id.*; (3) "uses other indices to check the reasonableness" of the RSI score by, for example, comparing the dealer's performance to that of the other domestic brands (namely, Ford and Chrysler) in its APR and by looking at the dealer's share of the Chevrolet sales made in its own APR, A1214-15; (4) considers "not only the dealer's RSI but also other mitigating factors which might explain failures to meet the sales targets" in making a termination decision, A1211; and  (5) "will not seek to terminate a

dealer simply because the dealer did not achieve an RSI of 100," *id*.

Notwithstanding these specific findings of Judge Hellerstein, Beck argues that GM's use of the RSI metric is unreasonable, arbitrary and unfair because, supposedly, a failure to achieve average performance (*i.e.*, an RSI of 100) can result in termination. *See*, *e.g.*, Beck Br. at 43; Beck Reply Br. at 2, 10-17. But Beck's premise is contrary to Judge Hellerstein's findings, the evidentiary basis of which Beck does not even attempt to challenge. Moreover, it was not the issue that was tried by Judge Hellerstein. That issue was whether GM had violated VTL §463(2)(gg) by "us[ing] an unreasonable, arbitrary or unfair sales or other performance standard in determining a franchised motor vehicle dealer's compliance with a franchise agreement." In finding that GM did not violate this statute, Judge Hellerstein properly considered the way in which GM actually "uses" the RSI standard – *i.e.*, to "exhort" improved performance from below-average dealers and to seek to terminate only those dealers at the very bottom of the RSI ratings, and then only if (i) the dealer has failed to improve despite prior cure notices, (ii) other indices confirm the reasonableness of the RSI rating, and (iii) there are no mitigating factors that might explain the dealer's performance. A1211; A1214-15.

As Judge Hellerstein advised the parties before the trial, "[t]his is not a termination case." A893. That case, Judge Hellerstein said, could be "tr[ied]

elsewhere." A894.  On that basis, Beck itself argued (successfully) that certain evidence concerning its poor performance should be excluded from the trial. A903.  Beck further advised Judge Hellerstein that the issue before him was not a legal issue but "purely facts and figures" and "a pure expert case."  A887, A903.

Now that Judge Hellerstein has found GM's expert evidence to be more persuasive than Beck's, however, Beck appears to ask this Court for a sweeping legal ruling that RSI and similar metrics used by other manufacturers may not be used in dealer termination cases.  That is an issue that should be decided on a case-by-case basis in *actual* termination cases – not in this case.  Contrary to Beck's assertions, the vast majority of courts and agencies ruling on dealer terminations for poor sales performance – including the only sales termination case in which the New York Department of Motor Vehicles (the "DMV") has rendered a final decision – have found metrics similar to RSI to be a fair and reasonable way to evaluate dealer performance and a useful tool in determining whether there is due cause for termination.

Moreover, *no* court has held what Beck apparently asks this Court to hold – *i.e.*, that it is in all cases unreasonable, arbitrary, and/or unfair to use state average sales effectiveness as a benchmark in making a termination decision.

**STATEMENT OF FACTS**

Both of the certified questions touch on matters of vital importance to automobile manufacturers – *i.e.*, how they (1) assess their retail sales performance in the extremely competitive automotive market and (2) make decisions aimed at improving that performance. Evaluating and improving dealer performance is critical to improving brand performance and hence market share because manufacturers are prohibited under New York law from selling or leasing vehicles to the public other than through their franchised dealers. VTL § 463(2)(y).

As in most industries, automobile manufacturers look at their market share and look for opportunities to improve that share. In this process, automobile manufacturers have a unique ability to determine how well a brand is performing in a specific geographic area because of state law requirements that every automobile be registered and that every registration have a specific home or business address. *See* A925. As a result, unlike manufacturers of television sets or washing machines, an automobile manufacturer can obtain reliable information concerning the exact locations not only of the customers who have purchased its various car models and the dealers who sold them but also those of the customers who purchased its competitors' models. *See* A925, A1001-03, A1091.

Registration data is collected from the states by companies such as R. L. Polk, from whom most manufacturers purchase such information. *See* A925,

A1001. That information is then analyzed by the manufacturers and by companies such as Urban Science Applications, Inc. ("USAI"), which provides reports to manufacturers and dealers concerning (among other things) (i) how brands and dealers are performing in various markets, (ii) which dealers are selling specific vehicles to consumers who reside in specific markets, and (iii) where the brands and dealers have opportunities for additional sales. *See* A982-83, A1002-04, A1042-43, A1088-89.

Over the years, USAI and the industry have refined and improved their methods of assessing retail sales performance. For example, in calculating its market share, a manufacturer typically does not look at its share of all automobile sales but rather at its share of its "competitive group" – *i.e.*, the specific brands and vehicle models with which its brand and models compete. A1003. Thus, a luxury brand will not consider non-luxury vehicles and models in calculating market share. Moreover, in assessing performance in any specific geographic area, most manufacturers use a "segmentation" process to adjust for the popularity of various vehicle "segments" – *e.g.*, SUVs, pickup trucks, compact cars, etc. – in that specific geographic area. A1096-98; *see, e.g., Superior Pontiac Buick GMC, Inc. v. Nissan North America, Inc.*, No. 08-10642, 2012 WL 1079719, at *6 (E.D. Mich. Mar. 30, 2012) ("*Superior Pontiac*").

To assess not only how well the dealer is performing but also whether changes need to be made to the dealer network, most manufacturers assign to each dealer an area for assessing retail sales performance. A925, A930.  GM calls this an "Area of Primary Responsibility" or "APR."  *See* A1092, 1095.[3]  Other manufacturers use other terms, such as "Area of Responsibility" ("AOR"), "Primary Market Area" ("PMA"), or "Area of Statistical Analysis" ("ASA"). *See, e.g., Fred Lavery Co. v. Nissan North America, Inc.,* 99 F. App'x 585, 587 (6th Cir. 2004) ("*Fred Lavery*") (PMA "is a geographic area . . . [used] as a tool to evaluate [dealer's] performance of its sales obligations"); *Hartley Buick GMC Truck, Inc. v. American Honda Motor Co., Inc.,* No. FMD 2010-05, at 4, ¶ 10 (N.Y. DMV Div. of Safety & Bus. Hearings Nov. 1, 2011) (ASA's are created to evaluate performance), *aff'd,* No. 28447 (N.Y. DMV Appeals Bd. Feb. 28, 2012) ("*Hartley Honda*").  This brief will refer to all such areas as "APRs."

An APR generally consists of the census tracts or zip codes that are closer (based on air distance or driving miles) to the dealer than to any other same brand dealer, based on the assumption that the dealer has the geographic advantage over any other same-brand dealer with respect to customers in that APR. A931, A973, A1095; *see, e.g., Superior Pontiac,* 2012 WL 1079719, at *9-10; *Hartley Honda,*

---

[3] In APR's that are served by multiple dealers, such as Westchester County, GM assigns each dealer "AGSSA" within the APR. A1250. An AGSSA is determined in the same manner as, and used for the same purposes as, the APR in single-dealer markets. Accordingly, this brief will use the single term "APR."

at 4, ¶ 10.  APRs are assigned by census tract or ZIP code because registration data can be linked to a particular census tract or ZIP code.  *See* A930, A1002.

As with GM, for most manufacturers an APR is not an exclusive sales area – *i.e.*, it does not "belong" to the dealer and any dealer can sell to customers in that APR.  A966, A973, A1105; *see, e.g.*, *Infiniti Auto. of Norwood, Inc. v. Nissan North America, Inc.*, No. 2004-00010, at 3 (Mass. Super. Ct. Aug. 4, 2005) ("PMA's are non-exclusive").  One of the principal purposes of assigning APRs is to determine whether changes need to be made to the dealer network – in which case changes may need to be made to the APR itself.  A1004-05, A1089; *see, e.g.*, *Rambasek v. Nissan North America, Inc.*, No. 09-03-MVDB-286-D, at 14 (Ohio MVDB Jan. 7, 2005) ("*Rambasek*") (manufacturer "changes its PMAs routinely, and relatively frequently, because of the dynamic nature of demographics and other factors").  For example, after assigning an APR to a particular dealer, the manufacturer may determine that population growth, economic growth, increased vehicle registrations and/or increased competition in a particular area in or near the APR calls for the appointment of another dealer in that area.  When this occurs, changes will necessarily be made to the existing dealer's APR, because certain of the census tracts or zip codes assigned to that dealer will be closer to the new dealership.  *See* A988.  As explained by the court in *BMW of North America, Inc.*

*v. New Motor Vehicle Board,* 162 Cal. App. 3d 980, 209 Cal. Rptr. 50 (1984) ("*BMW*"):

> The total group of zip code areas assigned to a particular dealer is that dealer's A.O.R.  By design, these areas of responsibility throughout the United States are contiguous. … [I]t follows that the appointment of a new dealer will necessarily alter the A.O.R.s of the nearest dealers.

*Id.* at 992, 209 Cal. Rptr. at 58 (holding that change to APR was not a "modification" of franchise).

Manufacturers may also change APRs when they discover that a dealer is not penetrating certain census tracts or zip codes assigned to it.  For example, the manufacturer may determine, based on traffic or shopping patterns or natural boundaries (such as a river), that those particular census tracts should be reassigned to another existing dealer whom customers in those census tracts or zip codes appear to find more convenient.  *See* A931.  In addition, manufacturers must *routinely* modify APRs when the U.S. Government changes census tracts (which occurs every 10 years) or when the U.S. Post Office changes zip codes (which can happen more frequently).  *See, e.g., Superior Pontiac,* 2012 WL 1079719, at *9.

Given the basic purpose and functions of an APR, and the need to adjust it as market conditions evolve, the franchise agreements of most manufacturers, like

GM's, (1) do not specify a precise APR and (2) provide that the manufacturer can revise the APR in its discretion.[4]

As mentioned above, one of the purposes of an APR is to assist in assessing the individual dealer's sales performance.   Most manufacturers use a "sales effectiveness" metric which is similar (but not necessarily identical in all aspects) to the RSI metric used by GM.  A971, A985, A1054-55, A1094; *see, e.g., Ralph Gentile, Inc. v. State Div. of Hearings & Appeals*, 334 Wis. 2d 712, 734-35, 800 N.W.2d 555, 566 (Wis. Ct. App. 2011) (most manufacturers use sales effectiveness in one form or another).  Beck's own expert admitted that "sales effectiveness is a valid way to measure a dealer's sales performance." A971.

Simply put, sales effectiveness is a comparison of the dealer's actual sales, wherever made, to the dealer's "expected sales." *See* A1006.  Expected sales are calculated with reference to the opportunity available to the dealer in its APR. Typically, expected sales are calculated by applying, on a segment-adjusted basis, the brand's market penetration rate in a broad geographic area – such as the state, the region, or the nation – to the actual competitive group registrations in the dealer's APR.  A926-27, A971, A1003, A1094; *see In re Ralph Gentile, Inc. v. Nissan North America, Inc.*, No. TR-07-0001, at 15 (Wis. Div. of Hearings &

---

[4] Amici note, however, that some manufacturers have, at certain times, granted exclusive sales areas to dealers in their franchise agreements and designated those areas as APRs or by some similar name.  Franchises that grant such exclusive sales areas would be subject to a different analysis on the modification issue than that in this case.

Appeals, Feb. 4, 2010) ("*Ralph Gentile*") (explaining sales effectiveness), *aff'd sub nom. Ralph Gentile, Inc. v. State Div. of Hearings & Appeals*, No. 10-cv-1050 (Wis. Cir. Ct. Sept. 13, 2010), *aff'd*, 334 Wis. 2d 712, 800 N.W.2d 555 (Wis. Ct. App. 2011).

Manufacturers – including GM, as Judge Hellerstein specifically found, A1211 – do not take the position that a dealer may be terminated simply for being below average. *See, e.g., Fred Lavery*, 99 F. App'x at 592-93; *Love Nissan, Inc. v. Nissan North America, Inc.*, DOAH Case No. 04-2247, at 50-51 (Fla. DHSMV Apr. 13, 2006) ("*Love Nissan*") ("The magnitude of the short-fall must be considered in determining whether the dealer's performance is so ineffective as to warrant termination."). Comparison to an average is a way of grading all dealers on a common scale – much the way colleges grade students on a "curve" in which the average grade is a "C." A1063, A1092; *see Love Nissan*, at 50; *accord, In re Seacoast Imported Auto, Inc.*, No. 04-06, at 11 (N.H. Motor Vehicle Ind. Bd. Apr. 12, 2010) ("*Seacoast*"), *aff'd, Seacoast Imported Auto, Inc. v. Nissan North America, Inc.*, No. 218-2010-CV-471 (N.H. Super. Ct. Nov. 29, 2010).

As the numerous cases cited in the parties' briefs show, dealers served with termination notices typically have sales effectiveness that is substantially below average (often only a small fraction of average) for extensive periods of time and are "at the very low end of the spectrum." A1006; *see, e.g., Ralph Gentile*, at 8

- 14 -

(upholding termination of dealer whose sales effectiveness declined from 58.3% to 40.7% of regional average over five-year period); *Seacoast*, at 11 (between 44.3% and 23.1% of regional average); *Love Nissan*, at 18-25, 43 (termination notice was based on dealer's performance during three-year period in which the dealer's sales effectiveness ranged between approximately 45% and 57% of regional average).

Moreover, as Beck's own "distinctions" of the cases relying on poor sales effectiveness in upholding terminations show, manufacturers (including GM, as Judge Hellerstein specifically found) look at other metrics to confirm that the dealer's poor sales effectiveness is not due to factors beyond its control.  *See* Beck Reply Br. at 21-33.

Sales effectiveness, however, provides a common metric on which *all* same-brand dealers can be evaluated, and thus avoids the inevitable claims of discrimination that would arise if Beck's alternative were adopted – *i.e.*, a different metric to judge every dealer.

## ARGUMENT

### I.   GM DID NOT USE AN UNREASONABLE, ARBITRARY OR UNFAIR PERFORMANCE STANDARD

Section 463(2)(gg) makes it unlawful for a manufacturer "[t]o use an unreasonable, arbitrary, or unfair sales or other performance standard in determining a [dealer's] compliance with a franchise agreement."  Judge Hellerstein found that GM did not do so.

The question certified by the Second Circuit asks whether RSI is an "unreasonable, arbitrary, or unfair" standard "because it does not account for local variations beyond adjusting for the local popularity of general vehicle types."[5] GM's use of RSI (i) is not "unreasonable" because RSI is an objective metric that takes account of most of the relevant factors, and no alternative metric that takes account of additional relevant factors has been devised or proposed; (ii) is not "arbitrary" because (among other things) GM uses other metrics to check the RSI result and to address any significant alleged local variations such as import bias; and (iii) is fair because it is used to evaluate *all* Chevrolet dealers in the state of New York, rather than devising separate, unequal standards for each dealer.

The vast majority of courts and agencies that have heard evidence on the "sales effectiveness" metric have found it to be a reasonable way to evaluate dealers' sales performance. These tribunals include the New York DMV, which upheld Honda's use of state-average sales effectiveness in deciding to terminate a dealer for poor sales performance in *Hartley Honda, supra*.

In addition to *Hartley Honda*, GM has cited ten cases from seven (7) other states in which the court or agency relied on sales effectiveness as a reasonable benchmark in sustaining a dealer termination. *See* GM Br. at 56-58. There are

---

[5] Amici note that GM's expert, Sharif Farhat, testified that it was not appropriate to adjust for the other factors urged by Beck. A1093, A1098, A1102, A1106, A1146. Amici respectfully submit that the actual issue on this appeal should be whether the trial court was "clearly erroneous" in crediting Farhat's opinion over that of Beck's expert, based on the entire record in this case.

numerous additional cases reaching the same conclusion. *See, e.g.*, *Love Nissan*, at 14, ¶ 20 ("Historically, by case law, and by expert testimony in the instant proceeding, it is found that [the manufacturer's] method for evaluating its dealers' sales performances is a reasonable, industry-accepted practice for evaluating new car dealers."); *Seacoast*, at 17 ("The methodology that Mr. Farhat used in reaching his conclusion that Nissan properly terminated [dealer] has been recognized and accepted by courts, administrative agencies, and this Board"); *General Motors Corp. v. Stan Olsen Pontiac GMC-Trucks, Inc.*, No. CI 03-2208, at 6-7 (Neb. Dist. Ct. Dec. 9, 2003) (upholding termination of GM dealer based on RSI and finding that "GM's methods for determining sales performance appear to be reasonable."); *Rambasek*, at 25-27 (rejecting attack by dealer, who relied on two of the same cases Beck cites here, on reasonableness and fairness of sales effectiveness methodology); *Lanham Ford, Inc. v. Ford Motor Co.*, No. MDOT-MVA-12-03-10560, at 36-41 (Md. MVA Aug. 10, 2005) (finding Urban Science's sales effectiveness methodology, and Ford's similar methodology for evaluating dealer, to be reasonable and fair).[6]

---

[6] Amici note that, of the six non-GM cases cited by Beck, four were decided in the 1960's or 1970's and involved Chrysler's former "MSR" index, which is not the same as the segment-adjusted sales effectiveness test. *See* Beck Br. at 37-39. In the only recent case cited by Beck, the Ohio Motor Vehicle Dealers Board expressly acknowledged "that the [sales effectiveness] standard has been accepted by this Board and others as a reasonable measure of performance." *Sims Buick-GMC Truck, Inc. v. Nissan North America, Inc.*, No. 9-12-MVDB-364-D, at 20 (Ohio MVDB Feb. 4, 2011), *aff'd sub nom. Sims v. Nissan North America, Inc.*, Nos. 12 AP 833, 12 AP 835, 2013 WL 3270914 (Ohio Ct. App. Jun. 25, 2013). Thus, Beck misrepresents the

Courts and agencies have repeatedly rejected the argument, reprised by Beck here, that using "average" sales effectiveness as a benchmark is unreasonable because, statistically speaking, about half of the dealers will be below average. In *Fred Lavery*, for example, the U.S. Court of Appeals for the Sixth Circuit rejected a dealer's argument that its manufacturer unreasonably used sales objectives tied to regional average performance:

> Lavery claims that the district court erred when it concluded that achieving the regional average in sales penetration was a "reasonable sales objective" under the agreement. ... As Lavery sees it, requiring average performance is inherently unreasonable because it means that a large number of dealers will be in breach of their dealer agreements at any given time. Whether one acts "reasonably" is generally a mixed question of law and fact.
>
> . . . .
>
> Lavery, however, is in no position to challenge Nissan's actions on this ground. The dealership was not terminated for being average or even for being below average but for being conspicuously below the performance of other dealerships.

*Fred Lavery*, 99 F. App'x at 592-93 (citations omitted).

Beck attempts to "distinguish" this huge body of case law on the ground that, in most cases, the manufacturers relied on metrics and factors *in addition to* sales effectiveness. Beck Reply Br. at 21-33. But so does GM, as Judge Hellerstein found, A1211, A1214-15 – a finding based on extensive evidence in the record. *See* A1005-06, A1008, A1050-53, A1059-61, A1121-22.

---

great weight of the case law when it claims that manufacturers have "met with limited success" in cases involving the sales effectiveness metric. Beck Br. at 37.

Beck's "distinctions" of the many cases that are contrary to its position merely prove the point that the reasonableness of a manufacturer's use of sales effectiveness in making a termination decision must be decided on a case-by-case basis. Moreover, Beck cites *no* case holding what Beck apparently asks this Court to hold – that it is in all cases unreasonable to use state-average sales effectiveness as a benchmark in making a termination decision.

A number of the tribunals that have found sales effectiveness to be a reasonable metric have recognized that it takes most of the relevant factors into account because it is based on actual consumer behavior in the APR. For example, it takes the local economy and local demographics into account because such factors are reflected in actual consumer behavior. *See, e.g., Superior Pontiac*, 2012 WL 1079719, at *10-11, 18; *Love Nissan*, at 32-33, ¶¶ 72, 74; *Ralph Gentile*, at 9, ¶ 23.

In addition, manufacturers use other metrics to take account of any significant alleged local variations, such as "import bias." Here, GM took account of this factor by looking at the performance of the Ford and Chrysler dealers in Beck's APR, both of whom were performing at *above* state average for their brand. A988; A1093 and A1135 (in 2012, Beck sold 335 Chevrolets, while Ford dealer on same road sold over 1200 units and Chrysler dealer sold over 1500); A1109-13, A1158-59. Thus, even if Beck were correct that there is an "import bias" in certain

parts of the "downstate area," actual consumer behavior militates against finding such a bias in Beck's APR. Indeed, it appears that the principal bias in the area is an anti-Beck bias, since the vast majority of Chevrolet buyers who reside in Beck's APR buy their Chevrolets from other Chevrolet dealers. *See* A974 (Beck captures only 27% of the Chevrolet sales in its own APR); A1116, A1120-21.

Moreover, neither Beck nor its expert, Joseph Roesner, has proposed an alternative metric that takes into account the factors that they claim sales effectiveness does not take into account.[7] In fact, when asked by Judge Hellerstein how he would do so, all Roesner could offer was that "you [should] drill down a bit" and "take . . . into account" the "things that affect this dealer or this market differently than what we're using as a benchmark." A966. That, of course, is exactly what GM did when it looked at the performance of the other domestic dealers in Beck's APR and at Beck's share of the Chevrolet sales in its APR. Moreover, all Roesner did in this case was to apply the *same* sales effectiveness methodology as GM, using different geographical benchmarks. A968 (in response to Judge Hellerstein's question, Roesner admits he is "applying the same methodology as was used [by GM] to create statewide averages" using "alternative market areas").

---

[7] For example, one of the principal "factors" Beck cites is that there is allegedly "more competition" in the downstate area than upstate. But Roesner conceded, in response to questions by Judge Hellerstein, that (1) there was also more density of population downstate and (2) in order to conclude there was more competition downstate, Roesner would have to compare the population densities – which Roesner admitted he hadn't done. A988.

Finally, while courts and agencies have upheld the use of national, regional, and state average as a sales effectiveness benchmark, using state average enables the manufacturer to evaluate all dealers in the state on an equal basis. Dealers within a state are subject to the same business conditions, such as taxes and registration fees. A1082. In addition, the franchise relationship is regulated on a state-by-state basis. Many state motor vehicle statutes have anti-discrimination provisions that require the manufacturer to treat all dealers in the state equally. *See, e.g*, Fla. Stat. § 320.641(3) (franchisor must apply grounds for termination in a "uniform and consistent manner"); Ga. Code § 10-1-663(b)(3); Mo. Rev. Stat. § 407.825(27). Moreover, the statutory prohibitions on termination without "due cause" and "good faith," set forth in the New York Act and most other state franchise statutes, effectively prohibit discrimination in evaluating dealers' performance. Accordingly, if manufacturers were to use different metrics to evaluate dealers within the state, they would be faced with claims of discrimination by every dealer whose sales performance the manufacturer found unsatisfactory.

Accordingly, the first certified question should be answered "No." In addition, Amici submit that the large body of case law cited above demonstrates that the issues raised by Beck are not susceptible of "blanket" rules to apply to the entire industry. Manufacturers use sales effectiveness in different ways and have different processes for making termination decisions. The cases reflect, for

example, that the duration of cure periods provided by manufacturers varies and that there is no automatic performance trigger for termination. For these reasons, the reasonableness of a manufacturer's use of sales effectiveness (whether in the context of termination or otherwise) presents a question of fact that should be decided on a case-by-case basis.

## II.   THE APR REVISION WAS NOT A PROHIBITED MODIFICATION OF THE FRANCHISE

### A.   Exercising a Contract Right Is Not a "Modification"

Judge Hellerstein correctly ruled that where, as here, the franchise agreement gives the manufacturer the discretionary right to revise the APR, the manufacturer does not "modify" the franchise under § 463(2)(ff) when it exercises that contractual right. His ruling is consistent with the statutory definition of "modification," basic contract law, and the evident legislative intent – which is to require a manufacturer to give notice when it intends to introduce a superseding franchise agreement or amendments to the terms and conditions of the franchise agreement. If § 463(2)(ff) were interpreted to apply to the manufacturer's exercise of its discretionary contract rights, it would impose unreasonable and unworkable procedural burdens on decisions that manufacturers must make on a regular basis.

For purposes of § 463(2)(ff), the statute defines "modification" as "any change or replacement of any franchise if such change or replacement may substantially and adversely affect the [dealer's] rights, obligations, investment or

return on investment." VTL § 463(2)(ff)(2).  The statute defines a "franchise" as "a written arrangement . . . in which a manufacturer or distributor grants to a [dealer] a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto . . . and/or pursuant to which a [dealer] purchases and resells or offers . . . products associated with the name or mark or related components of the franchise." VTL § 462(6).

By referring to a "change or replacement" of the franchise, the legislature intended to address the manufacturer's imposition of a change to the parties' "written arrangement" – *i.e.*, the introduction of a superseding franchise agreement or amendments to the written terms of its franchise agreement.  From time to time, manufacturers revise their standard dealer agreement provisions for various reasons, such as addressing perceived gaps or dealing with newly-arising issues. When the stated term of an individual dealer's franchise agreement expires, the manufacturer may propose to use the revised form of standard provisions for the renewal of the franchise.  In addition, some franchise agreements – such as the GM agreement in this case – give the manufacturer the right to replace an existing dealer's agreement with "a superseding form of dealer agreement or an amendment to the dealer agreement" that it "offers . . . to its dealers generally." A179.

- 23 -

Statutes such as § 463(2)(ff) are intended to give the dealer notice-and-protest rights when the manufacturer introduces a superseding agreement or general amendment that may have a substantial, adverse effect on the dealer. *See, e.g., Bray v. Tejas Toyota, Inc.*, 363 S.W.3d 777 (Tex. App. 2012) (distributor offered new form of agreement to dealer at time of renewal).

It is not a "modification" of a franchise, or of any other contract, when one of the parties exercises a discretionary right under the contract. A contract may "leave[] particulars of performance to be specified by one of the parties." N.Y.U.C.C. § 2-311(1); *In re Associated Teachers of Huntington, Inc. v. Board of Educ.*, 33 N.Y.2d 229, 233-34, 351 N.Y.S.2d 670, 673 (1973) ("Both common law and statutory law recognize the existence of contractual obligations where either the satisfactory performance of one party or the existence of conditions precedent is left solely to the good faith judgment of the other party.").[8] When that party specifies such particulars, it obviously does not "modify" the contract.

Given the nature and scope of a motor vehicle franchise, the agreement must necessarily leave certain particulars of performance to one party or the other. For example, the dealer has the discretionary right to decide which specific vehicles to order, how to price them to consumers, how much advertising to do, etc.

---

[8]  A motor vehicle dealer agreement is a contract for the sale of goods under Article 2 of the U.C.C. *Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.*, 966 F. Supp. 167, 170 (E.D.N.Y. 1997); *Subaru Distributors Corp. v. Subaru of America, Inc.*, 47 F. Supp. 2d 451, 464-70 (S.D.N.Y. 1999). *See also* VTL § 470 ("The provisions of this article shall be in addition to and not in lieu of those contained in the uniform commercial code.")

Similarly, the franchise agreement necessarily gives the franchisor, who will be supplying products to the franchisee over an extended period of time, discretion with respect to various matters.  These include the wholesale price of vehicles sold to the dealer, *see* A152 (Art. 6.3.1), the introduction or discontinuation of vehicle models, *see* A151 (Art. 6.1), and the allocation of vehicles among its dealers, *see Id.*

It is unlikely that the legislature intended to require manufacturers to provide notice and an opportunity for dealers to protest every time the manufacturer made a decision with respect to vehicle pricing or model availability that might "substantially and adversely" affect a particular dealer.  It is even more unlikely that the legislature intended to give judges and juries the authority to determine whether, for example, vehicle prices should be changed, what vehicle models should be introduced or discontinued, or whether a manufacturer can adjust its formula for allocating vehicles among its dealers.

Yet, if Beck were correct, each time a manufacturer decided to make any such changes, the manufacturer might be required to provide notice and an opportunity for judicial review.  After all, there appears to be no meaningful statutory basis to distinguish these discretionary rights from GM's discretionary right to revise Beck's APR.

The statute itself, however, does provide a meaningful basis for determining when a manufacturer must give notice of its intention to exercise a discretionary contractual right: *i.e.*, the statute expressly provides for notice-and-protest rights. Examples include a manufacturer's intention to terminate or not renew a franchise, § 463(2)(d); to require a renovation of the dealership facilities, § 463(2)(e)(1); to withhold consent to a transfer of an interest in a franchise, § 463(d), (k); or to charge back a warranty or sales incentive payment, § 465(7).

Another example, and one which is of particular relevance here, is the dealer's statutory notice-and-protest right when the manufacturer intends to add a new dealer to its network or to permit the relocation of an existing dealer. Most dealer agreements (like GM's) provide that the dealer's appointment is "non-exclusive" and either expressly or implicitly give the manufacturer the discretion to appoint additional dealers or to relocate dealers closer to an existing dealer. *See, e.g.*, A141 (Art. 1), A143-44 (Art. 4.3). In the 2008 amendments, however, the state legislature expressly limited this right by adding § 463(2)(cc). That provision requires a franchisor to give notice when it intends to establish a new dealer in, or relocate an existing dealer into, a statutorily-defined "relevant market area" (or "RMA"). VTL § 463(2)(cc)(1); *see* VTL § 462(15) (definition of RMAs). If a dealer provided with such notice files a protest, the manufacturer must show "good cause" to establish or relocate the dealer. VTL § 463(2)(cc)(1), (3).

The 2008 amendments, however, did not include a similar provision regarding manufacturers' rights to alter a dealer's APR.   This absence is particularly significant because, at the time the 2008 amendments were adopted, a number of states *had* enacted statutes specifically limiting a manufacturer's right to modify a dealer's APR.   *See* GM Br. at 65 (collecting statutes).   The New York legislature did not follow suit and adopt an APR-modification statute.

Concluding that an APR change is not a "change . . . of the franchise[]" under § 463(2)(ff) would not deprive franchisees of the protections of the Dealer Act.   To the extent that a change in the APR affects the standard by which the dealer's performance is measured (Beck's principal complaint here), the dealer can challenge the fairness of the standard under § 463(2)(gg).   Moreover, neither an enlargement nor a reduction of the APR affects a dealer's geographical protection from competition because the statutory RMA is not defined by reference to the APR.

The latter point distinguishes both of the out-of-state cases on which Beck relies.   In *Nissan North America, Inc. v. Royal Nissan Inc.*, 794 So. 2d 45 (La. Ct. App. 2001), the Louisiana statute defined the dealer's protest area, as well as its relocation rights, with reference to the APR assigned by the manufacturer.   *Id.* at 47-49.   Similarly, in *Racine Harley-Davidson, Inc. v. State Div. of Hearings & Appeals*, 292 Wis. 2d 549, 717 N.W.2d 184 (2006), the Wisconsin statute

expressly *required* the manufacturer "to designate in writing the area of sales responsibility assigned" to the dealer and then defined the dealer's protest area (i.e., the RMA) as the greater of that APR or a 10-mile radius.  717 N.W.2d at 207 (citing Wis. Stat. §§ 218.0114(11) and 218.0116(7)).[9]  The Dealer Act has no similar provisions; in New York, a change in a dealer's APR has no effect whatsoever on the RMA.

The dangers of converting § 463(2)(ff) into an APR-modification statute are illustrated by the related cases of *JJM Sunrise Automotive, LLC v. Volkswagen Group of America, Inc.*, 46 Misc. 3d 755 (Sup. Ct. Nassau Co. 2014) and *Luxury Autos of Huntington, Inc. v. Volkswagen Group of America, Inc.*, No. 602591-14, 49 Misc. 3d 1207(A), 2015 WL 5946047 (Table) (Sup. Ct. Nassau Co. Sept. 21, 2015), and the decision in *Van Wie Chevrolet, Inc. v. General Motors, LLC*, No. 2012-0284 (Sup. Ct. Onondaga Co. June 13, 2014).  In each of these cases, a dealer plaintiff challenged the establishment or relocation of a dealership that was not protestable under § 463(2)(cc) by alleging that the establishment or relocation would change its APR and thereby effect a modification of its franchise in violation of § 463(2)(ff).

In *JJM Sunrise* and *Luxury Autos,* Audi proposed to establish a new dealership on Long Island that was outside of the protest area afforded to each of

---

[9] The current Wisconsin statute has a similar definition of the RMA, which includes all areas in the 10-mile radius and the APR.  *See* Wis. Stat. § 218.0101(30).

the plaintiffs by § 463(2)(cc).  Based on the standard industry practice of assigning to each dealer the census tracts closest to that dealer, however, certain of the outer census tracts of each plaintiff's existing APR would need to be assigned to the new dealer.  The court in *JJM Sunrise* and *Luxury Autos* rejected the dealers' contention that Audi was required to give the dealers notice and an opportunity to protest the changes to their APRs.  The court observed that the Dealer Act had created a right to protest new dealerships in the RMA "with great particularity," and that permitting the dealers to use § 463(2)(ff) to protest the resulting change in their APRs based on the otherwise non-protestable establishment a new dealership would frustrate the legislative intent.  *JJM Sunrise*, 46 Misc. 3d at 766; *Luxury Autos*, 49 Misc. 3d 1207(A).

The *Van Wie* court reached the opposite conclusion.  There, GM approved an existing dealer's request to relocate, which was exempt from protest.  *See* VTL § 463(2)(cc)(2) (providing for various relocation exemptions).  Because the relocating dealer would be moving closer to plaintiff, however, plaintiff complained that the move would reduce the size of its APR.  The *Van Wie* court ruled that this reduction was a protestable "modification" of the plaintiff's franchise on stated premises that are clearly incorrect.  For example, the court ignored the Dealer Act's definition of a franchise and stated that (1) a franchise "*could be* the right or license granted to an individual or group to market a

company's goods or services in a particular territory" and (2) "an APR and a franchise are identical in practical reality." *Van Wie*, No. 2012-0284, at 3 (emphasis added). Thus, the *Van Wie* Court was operating under the mistaken belief that an APR is an exclusive sales area, rather than what the franchise agreement says it is – an area for assessing the performance of the dealer and the brand.

Amici submit that *Van Wie* was decided incorrectly and that, as recognized by the Court in *JJM Sunrise* and *Luxury Autos*, an interpretation of § 463(2)(ff) permitting the dealers to protest a manufacturer's exercise of its discretionary right to adjust APRs would be contrary to the legislature's intent. It would encourage more lawsuits like *JJM Sunrise*, *Luxury Autos*, and *Van Wie*, because dealers have a natural self-interest in blocking or delaying any same-brand competition, even if it is outside the area within which the legislature has given them the right to protest. It would also unduly hamper manufacturers, beyond the limits the legislature has prescribed, in their efforts to improve and adjust their dealer networks. *See BMW*, 162 Cal. App. 3d 992-94, 209 Cal. Rptr. at 59 (holding that change to APR was not a "modification" of franchise under California statute similar to § 463(2)(ff) and observing that a contrary result would give dealers "a perpetual territorial monopoly").

Accordingly, § 463(2)(ff) should not be interpreted to require notice and protest of a manufacturer's exercise of discretion, granted by the franchise agreement, to revise an APR.

**B.     Many Changes to a Dealer's APR Will Not "Substantially and Adversely Affect" the Dealer**

Even if the Court were to conclude that an APR revision may be a "modification" of a franchise under § 463(2)(ff) when the franchise agreement gives the manufacturer discretion to revise it, the Court should not rule as a matter of law (1) that GM was required to give notice in this case or (2) that all APR revisions by all manufacturers require such notice.

The Dealer Act requires notice only when "[the] change or replacement may substantially and adversely affect the [dealer's] rights, obligations, investment or return on investment." VTL § 463(2)(ff)(2). Accordingly, where the change will not have a substantial adverse effect, the manufacturer is not required to give notice. *Bray*, 363 S.W.3d 777 (even though distributor offered dealer a superseding form of franchise agreement upon renewal of the franchise, distributor did not have to provide statutory notice where the new agreement was "substantively the same" as the prior agreement).

Here, Judge Hellerstein never reached the issue of substantial adverse effect. Instead, he ruled that the revision to the APR could not be considered a "modification" of the franchise because the franchise agreement gave GM the right

to revise the APR.  Further, there is evidence in the record that the change had no adverse effect on Beck because GM continued to evaluate Beck's performance based on the previously-designated APR.  A973, A1076.  Accordingly, the case would need to be remanded for findings on the issue of substantial adverse effect.

Moreover, there are certain APR revisions that will have little if any adverse effect on a dealer and others that will actually benefit the dealer.  In this case, Beck claims that the change in census tracts adversely affects it because the change increases the number of competitive group registrations in Beck's APR and thereby increases the number of retail sales it must make to achieve an RSI of 100. Many APR revisions, however, involve the *removal* of census tracts from the dealer's APR, thus reducing the number of competitive group registrations and thereby *improving* the dealer's RSI.  *See Crown Auto Dealerships, Inc. v. Jaguar Cars*, DOAH Case No. 96-4657, at 4 (Fla. DHSMV March 17, 1997) (reduction of APR was not a statutory "modification" because it could not adversely affect dealer's rights), *aff'd*, 702 So. 2d 492 (Fl. App. 1997) (Table).

Moreover, as mentioned above, manufacturers routinely revise the geographical boundaries of APR's when the U.S. Government revises census tracts or the Post Office revises zip codes.  Revisions to APR's made simply to conform to such changes should not normally be subject to the notice and protest procedures because they are unlikely to have a substantial adverse effect.

- 32 -

Accordingly, the question whether an APR revision has a substantial and adverse effect on the dealer would need to be decided on a case-by-case basis. This Court should avoid any blanket ruling that all APR changes are subject to notice and protest.

## CONCLUSION

For the foregoing reasons, the Alliance of Automobile Manufacturers and the Association of Global Automakers respectfully request that this Court answer "No" to both certified questions.

Respectfully submitted,

**HOGAN LOVELLS LLP**

By: _____

John J. Sullivan
HOGAN LOVELLS US LLP
875 Third Avenue
New York, N.Y. 10022
(212) 918-3635

*Attorney for Amici Alliance of
Automobile Manufacturers and
Association of Global Automakers*

Dated:  February 4, 2016

# EXHIBIT E

# *The* GUY LAW FIRM *PLLC*

October 16, 2017

Deborah F. Collins, Esq.
Counsel GM Legal Staff
300 Renaissance Center
Detroit, Michigan 48265

**Re: Notice Pursuant to NYS Vehicle and Traffic Law 471-a**

Dear Deb

Pursuant to Section 471-a of the NYS Vehicle and Traffic Law, I am writing on behalf of my client, Pat Bombard, to formally request mediation of the dispute that you have maintained against his demand for renewal of his Franchise Agreement with GM.

As you have not responded to my repeated requests that you agree to terms for mediation, I will rely on the procedure set in Section 471-a to request your response within seven days.

Thereafter, we will proceed with a request under Section 471-b of the NYS Vehicle and Traffic Law to have the Commissioner of the Department of Motor Vehicles adjudicate your dispute of our franchise rights.

Sincerely,

Frederick R. Guy, Esq.

*The* **GUY LAW FIRM** PLLC

December 19, 2017

NYS Department of Motor Vehicles
Division of Safety and Business Hearings
6 Empire State Plaza
Albany, NY  12228

Re: Request of Pat Bombard for an Adjudicatory Hearing

Dear Commissioner,

Enclosed please find NYS Form AA-71 comprising a Statement of Facts supporting Mr. Pat Bombard's claim against General Motors Corporation for having repeatedly violating the provisions of Article 17-A of the NYS Franchised Motor Vehicle Dealer Act, together with the required documentation supporting his claim.  The $2,000.00 fee is also enclosed.

We are requesting an adjudicatory hearing so his claim and witnesses in support of it may me be heard by the Commissioner as soon as practicable.

Please do not hesitate to contact me if any further information is required.

Sincerely,

Frederick R. Guy, Esq.

enc.
cc:  GM Counsel Deb Collins

**NEW YORK STATE OF OPPORTUNITY.** | **Department of Motor Vehicles**

**Franchised Motor Vehicle Dealer**
**REQUEST FOR ADJUDICATORY PROCEEDING**
Division of Safety & Business Hearings
Telephone: (518) 474-1509
Fax: (518) 473-8505

## COMPLETE THE INFORMATION REQUESTED BELOW. PLEASE PRINT.

Name: Pat J. Bombard     AKA/DBA Bombard Car Company, Inc.

Address *(include number & Street)* 5 Wheeler Ave.

City Fayetteville     State NY    Zip Code 13066    Telephone # ( 315 )382-9464

Dealer Certificate of Registration No.: 7058987     Represented by: Frederick R. Guy, Esq

*Requests a New York State Department of Motor Vehicles Adjudicatory proceeding with:*

Franchisor General Motors Corporation - Chevrolet

Address *(include number & Street)* General Motors Global Headquarters

City Detroit     State MI    Zip Code 48625    Telephone # ( 313 )667-9844

Represented by *(if known):* Deborah F. Collins, Esq.

Address *(include number & Street)* 300 Renaissance Center

City Detroit     State MI    Zip Code 48625    Telephone # ( 313 ) 667-9844

## INSTRUCTIONS FOR REQUEST

1) All documents relevant to the claim(s) made in this request, including all correspondence between the dealer and franchisor, must accompany this request when it is filed with the Commissioner. Include a copy of the current franchise agreement that exists between the dealer and the franchisor, and a copy of the certificate of service (see Instruction #2). Submit to:

       NYS Department of Motor Vehicles
       Div. Safety and Business Hearings, Room 424A
       6 Empire State Plaza
       Albany, NY  12228

2) At the time this request is filed with the Commissioner, a true copy of this request, with copies of all documents filed with it, must be served upon the franchisor in any manner specifically permitted under the terms of the franchise agreement or, if no such manner is specified, then via certified mail, return receipt requested, addressed to the officer or employee of the franchisor from whom the dealer has received correspondence relevant to the claims made in this request.

3) This request must be accompanied by a non-refundable filing fee of two thousand dollars ($2,000). Attach a certified check or money order payable to the Commissioner of Motor Vehicles.

4) In a short, plain statement present the facts that support your claim that the franchisor has violated one or more specific provisions of Article 17-A Franchised Motor Vehicle Dealer Act. Also, describe your request for a specific remedy other than damages. *(Use additional sheets as necessary.)*

       Please See Attached Statement of Facts and Supporting Documentation

**Your attention is directed to the automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1) and 465(7).**

Please Sign Here     12/19/2017
                          Date

AA-71 (2/15)

## STATE OF NEW YORK - DEPARTMENT OF MOTOR VEHICLES
6 Empire State Plaza, Albany, New York 12228

Division of Safety and Business Hearings  Tel: (518) 474-1509  Fax: (518) 473-8505

|  |  |
|---|---|
| SAFETY AND BUSINESS HEARING )<br>BUREAU )<br>NOTICE OF HEARING )<br> )<br>in the matter of )<br>Pat J. Bombard DBA  Bombard Car Company, )<br>Inc. )<br> )<br>Dealer/Franchisee )<br> )<br>and )<br> )<br>General Motors Corporation-Chevrolet )<br> )<br>Franchisor )<br> )<br>RESPONDENT | Case No.   FMD201801<br><br>Date of Hearing: April 23, 2018<br>Time of Hearing:       9:00 AM<br>Place of Hearing:<br>   NYS Dept. of Motor Vehicles<br>   Western Lights Plaza<br>   4671 Onondaga Blvd Suite #100B<br>   Syracuse, NY 13219<br><br>Presiding Officer: Jeffrey Leibo |

YOU ARE HEREBY GIVEN NOTICE that an Adjudicatory Hearing, conducted by the New York State Department of Motor Vehicles, in accordance with Vehicle and Traffic Law Section 471-a, and 15 N.Y.C.R.R., part 127.13, has been scheduled between the above parties before the assigned presiding officer.

This hearing is a result of a *Request for Adjudicatory Proceeding*, filed by the franchised motor vehicle dealer with the Commissioner of the Department of Motor Vehicles. The matters asserted by the dealer are as per the attached sheet. If you are hearing impaired, an interpreter will be available to you if you notify the Safety and Business Hearing Bureau in advance. An interpreter for the hearing impaired will be provided at no charge. It is your responsibility to bring an English translator if needed. You are permitted to appear with counsel. You should be prepared to present all evidence and witnesses at the hearing.

Adjournments are not granted except for good cause based on all the circumstances. Requests for adjournments should be made to the Safety and Business Hearing Bureau, Department of Motor Vehicles, 6 Empire State Plaza, Albany, NY 12228. Contact the bureau promptly. Do not assume an adjournment has been granted without specific confirmation. **In case of inclement weather such as a snow/ice storm please call Safety Hearing at (518) 474-1509 on the morning of hearing to see if hearing is still on.**

**Franchisor:** You have **20 Days** from receipt of this Hearing notice to deliver to the assigned presiding officer at the above address, and to the Dealer-Franchisee, a short and concise answering statement in response to the Dealer-Franchisee's allegations, and of the facts on which you rely upon in defense of such allegations, along with any supporting documents. **Your attention is directed to the automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1) and 465(7).**

**Dealer-Franchisee:** You have **20 Days** from receipt of the Franchisor's answering statement, to submit to the presiding officer at the above address, an additional statement of facts and documentary material but only to the extent of answering any new matter raised by the franchisor.
Date:   1/31/18

### THE HEARING WILL START PROMPTLY

| | | | |
|---|---|---|---|
| Dealer/Franchisee: | Pat J. Bombard DBA  Bombard Car<br>Company, Inc. | Franchisor:<br>Address : | General Motors Corporation-Chevrolet<br>General Motors Global Headquarters |
| Address: | 5 Wheeler Avenue<br>Fayetteville, NY 13066 | | Detroit, MI 48625 |
| Telephone #: | 315-382-9464 | Telephone #: | 313-667-9844 |
| Represented By: | Fredrick R. Guy, ESQ | Represented By: | Deborah F. Collins, Esq |
| Address: | The Guy Law Firm PLLC | Address: | 300 Renaissance Center |
| | 3596 Pleasant Valley Road<br>Syracuse, NY 13215 | | Detroit, MI 48625 |
| Telephone #: | 315-314-7461 | Telephone #: | 313-667-9844 |

AA-70 (6/10)

This envelope is made from post-consumer waste. Please recycle - again.

PRESS FIRMLY TO SEAL

**P** **P**

UNITED STATES
POSTAL SERVICE®

PRIORITY MAIL

Origin: 18068
Destination: 10004
1 Lb & 10 Oz
Jun 13, 18
3528000489-10

**US POSTAGE PAID**
**$9.70**

Retail

1006

Expected Delivery Day: 06/15/2018

C014

PRIORITY MAIL 2-Day ®

USPS SIGNATURE TRACKING NUMBER

9510 8121 0877 8164 3896 79

WH
LABEL MAY BE REQUIRED.

PRESS FIRMLY TO SEAL

PRIORITY MAIL
POSTAGE REQUIRED

FROM:

PAT BON BARO
5 Wheeler Ave
Fayette n.y 13066

TO: UNITED STATES
BankRuptcy Court
SouthernDist of New York
ATT Honorable Vernon S
Broderick
One Bowling Green
New York. N.y. 1004 ?